## Re Condemnation by the City of Coatesville of Certain Properties and Property Interests for Use As a Public Golf Course

C.P. of Chester County, no. 00-06048.

*John S. Carnes Jr.* and *Herbert Bass,* for condemnor City of Coatesville.

*Robert Lentz* and *Scott E. Yaw,* for condemnees Saha.
*Thomas Gibson,* for Verizon Pennsylvania Inc.
*Lynn R. Steen,* for PECO Energy Co.

MAHON, *J.,* January 11, 2002—And now, January 11, 2002, on consideration of the preliminary objections interposed by Richard A. and Nancy K. Saha[1] to both the initial declaration of taking filed by the condemnor the City of Coatesville[2] on August 2, 2000, and to an

---

1. Pursuant to section 406 of the Eminent Domain Code, the Act of June 22, 1964, sp. sess. P.L. 84, as amended, 26 P.S. §1-406. The condemnees will be referred to hereinafter as such, or as the "Sahas." No other condemnee has interposed preliminary objections to this taking and only the Sahas and the city have participated substantively at this stage.

2. Referred to as the "condemnor" or the "city."

amended declaration of taking filed on February 13, 2001, with respect to about 43 acres of the condemnees' about 47.5-acre tract located along Mount Airy Road and Kings Highway (Route 340) in Valley and West Caln Townships, Chester County, on which tract the city has proposed to locate facilities in connection with a regional recreation center including, particularly, a portion of a golf course and a golf training center, and on further consideration of the evidentiary record made by the parties pursuant to our order of August 27, 2000, and section 406(e) of the Eminent Domain Code,[3] and following an evidentiary hearing and oral argument conducted on July 26, 2001, and on further consideration of the written argument including proposed factual findings and legal conclusions presented by the parties, we enter the following:

## FINDINGS OF FACT

(1) The parties by stipulation of record on July 26, 2001, have agreed that the record for our consideration in the matter of the preliminary objections consists of the transcribed depositions of some 23 persons including the condemnees and officials, employees, and consultants of the condemnor, a series of some 54 documentary exhibits admitted without objection on behalf of the condemnees,[4] and some 36 documentary exhibits,[5] 29 of which ("C-1" through "C-32"[6]) were admitted without

---

3. 26 P.S. §1-406(e).

4. Referred to hereinafter as exhibits "Saha-1" through "Saha-54."

5. Referred to hereinafter as exhibits "C-1" through "C-39."

6. Exhibits "C-9," "C-11," "C-12," "C-25," "C-26" were intentionally omitted. Exhibit "C-21" is in three parts denominated "C-21A," "C-21B," "C-21C."

objection on behalf of the condemnor. With respect to the documentary exhibits marked for identification as exhibits "C-33" through "C-39," to which the condemnees have raised objection, we here overrule the said objections and accept the said exhibits of record. Exhibits "C-33" and "C-34" are the initial and amended declarations of taking which are the operative filings and are part of the record in any event. Exhibit "C-35" is a letter written by the condemnees' counsel which is objected to along with the affidavits marked as exhibits "C-36" and "C-37" solely on the ground that they were not identified at an earlier point in the pretrial proceedings. Since no surprise or prejudice is here asserted by the condemnees and no request was made to supplement the record in response to these exhibits, the objection is overruled. Exhibit "C-38" is our prior order dated April 27, 2001 in this case and exhibit "C-39" is a photocopy of a judicial opinion of another court which, although not properly introduced as a documentary exhibit, is certainly appropriate for our judicial notice and is received as such.

(2) The following witnesses were deposed on the dates indicated: City Council President Stephon Hines on February 1 and 28, 2001; City Council Vice President David Griffith on March 1 and 15, 2001; Council Member David DeSimone on February 9, 2001; Council Member Kevin Rolston on February 7, 2001; Council Member William J. Chertok on March 5 and 19, 2001; Council Member Winifred Mayo on March 8 and April 10, 2001; Council Member Carmen Green on February 27, March 20 and April 27, 2001; City Manager Paul G. Janssen Jr. on April 10, 11, 18 and 25, 2001; Christopher J. Charnas of Insignia/ESG Inc. on February 21, 2001; Russell Dunlevy of

Carroll Engineering Corporation on February 13 and March 14, 2001; City Finance Director Beth Butch on March 20, 2001; Nancy Saha on April 12, 2001; Richard Saha on April 12, 25 and 27, 2001; Richard Saha Jr. on April 25, 2001; John E. Robinson on April 25, 2001; Phyllis A. Robinson on April 25, 2001; Don L. Lipinski on April 25, 2001; Francis Newlin on April 27 and May 1, 2001; Chester Johnson on April 25, 2001; Gregory Lownes on April 27, 2001; Ernest E. Campos Sr. on April 27, 2001; Assistant City Manager Francis B. Pilotti on May 1, 2001; and City Solicitor John S. Carnes Jr., Esquire, on April 27, 2001. In the aggregate, the record consists of more than 2000 pages of transcribed testimony and more than twice this number of pages of documentary exhibits.[7] We have reviewed the whole of the record with a degree of care commensurate with the significance of the issues presented.

(3) The condemnor is the City of Coatesville, a city of the third class and the only city located in Chester County, Pennsylvania. The city is governed pursuant to, inter alia, a Home Rule Charter adopted on or about May 5, 1979, and now codified as chapter 11 of the city's Code of Regulations.[8] The city's governing authority is its city council.

---

7. Bates numbering of documentary exhibit pages suggests that more than 6,000 such pages were so designated.

8. See exhibit "Saha-38." The city's status as a home rule municipality does not expand its powers at issue in this case. See the Act of December 19, 1996, P.L. 1158, no. 177, 53 P.S. §2962(a)(2) and (10) recodifying sections 302(a)(2) and (10) of the Home Rule Charter and Optional Plans Law, the Act of April 13, 1972, no. 62, *as amended,* inter alia, by the Act of July 3, 1974, P.L. 421, no. 149 [adding sub-section (a)(10)], 53 P.S. §1-302(a)(2) and (10) (repealed) which

(4) Members of the Coatesville City Council, the official actions of which are here at issue, include Stephon Hines, president of city council;[9] David H. Griffith,[10] vice president of city council; William J. Chertok[11] (president of council in 1998 at the beginning of the period of time here pertinent[12]); David S. DeSimone;[13] Carmen Green;[14] Winifred S. Mayo;[15] and Kevin Rolston.[16]

(5) The condemnees are Richard A. and Nancy K. Saha.

(6) The Sahas' property here condemned is an about 49-acre parcel of ground located in Valley and West Caln Townships, in which the Sahas have lived since 1970 in a 250-year-old farm house which they refurbished and in which they raised four of their five children.[17]

provide: "With respect to the following subjects, the home rule charter . . . shall not give any power or authority to the municipality contrary to, or in limitation or enlargement of powers granted by the acts of the General Assembly which are applicable to a class or classes of municipalities: . . . (2) The procedures in the exercise of the powers of eminent domain . . . (10) Municipal planning under the provisions of . . . the Municipalities Planning Code [the Act of July 31, 1968, P.L. 805, as amended, 53 P.S. § 10101 et seq. (MPC)]."

9. Fifth Ward representative.

10. Second Ward representative.

11. At-large representative.

12. See the deposition of William J. Chertok at page 5. (Deposition testimony will be cited hereinafter in the general format: "[deponent surname] p. ___." The numbering of transcript pages continuously through successive sessions of the deposition of a witness allows the omission of deposition dates or transcript volume numbers. Nevertheless, in those instances where the date on which the deposition was taken as significant to the discussion, it will be provided.)

13. Fourth Ward representative.

14. At-large representative.

15. Third Ward representative.

16. First Ward representative; see exhibits "Saha-1" and "Saha-1A."

17. See exhibits "Saha-17," "Saha-18" and "Saha-20"; Nancy Saha p. 4.

(7) Two of the Sahas' children, their spouses, and certain of the Sahas' grandchildren, live on adjoining properties which were subdivided for them by the condemnees.[18]

(8) The property condemned by the city is known as 123 Mount Airy Road, and consists of tax parcels nos. 38-2-29.1 and 28-9-91 and, as described in the initial declaration of taking filed on August 2, 2000, as well as in the amended declaration of taking filed on or about February 13, 2001, with a gross area[19] of about 47.5 acres[20] but excluding therefrom a six-acre parcel and a nonexclusive right-of-way or easement, 20 feet in width, connecting the six-acre parcel with Mount Airy Road.[21]

(9) In early 1998, during the council presidency of William Chertok, a citizen with the surname of Imperato approached city council with a proposal to develop the city's closed landfill property as a gun club and shooting range.[22]

---

18. See exhibit "Saha-36" (annotated version of page C004745 to which arrows and labels have been added indicating the location of the home of Amy Saha and her husband, Craig Smith, and their children Kirby, Dylan, and Riley; and of the home of Joanne Saha, her husband Jeff Voelcker, and their children Joanne, Jeffrey, and Gretchen).

19. Following an earlier condemnation of about 1.5 acres by the Commonwealth, Department of Transportation. See Dunlevy pp. 116-17.

20. *Id.*

21. See for example, exhibit "Saha-20"; the "Plan of condemnation T.P.N. 38-02-29.1, T.P.N. 28-09-91" prepared by Carroll Engineering Corporation, Consulting Engineers, dated June 5, 2000 and based on a July 31, 2000 survey certified by Thomas A. Watkins.

22. See Chertok p. 5.

238

(10) City council was concerned with liability and other issues raised by the gun club proposal, gave no immediate response to Imperato, and became convinced that a more appropriate use for landfill property must be found.[23]

(11) Council was also motivated in this regard by the continuing expense related to environmental monitoring of the landfill property, an expense which, in 1998, was about $30,000.[24]

(12) Consideration of the matter of development of the city's lands for recreational purposes including the possibility of a municipal golf course began with a discussion of city council in executive session on September 28, 1998, at which time the council considered the retention of Carroll Engineering Corporation to conduct a feasibility study.[25]

(13) City council took formal action to authorize the retention of an expert consultant "to study alternative proactive uses for retired city landfill ground" during the course of the public meeting held later on September 28, 1998.[26]

---

23. *Id.*

24. Chertok p. 6; Janssen pp. 18-19.

25. See exhibit "C-28"; executive session agenda, at page C005938. Condemnees concede that Carroll Engineering and its vice president, Russell S. Dunlevy P.E. who was primarily responsible for the feasibility study, possess the appropriate expertise to undertake the assignment. See exhibit "C-27"; the condemnees response to written interrogatories at ¶24. For a summary of Mr. Dunlevy's education and professional experience see exhibit "C-3"; Russell Dunlevy curriculum vitae;

26. See exhibit "C-29"; agenda, at p. C002331; action item (1).

(14) In December 1998, the city engaged Carroll Engineering Corporation to study the feasibility of development of city-owned property for active and passive recreation, commercial uses, and residential development.[27]

(15) The city-owned property, consisting of the former landfill which occupied about 40 acres of the 77-acre parcel[28] and an adjacent tract to the west of the landfill and south of Route 30, aggregated about 110 acres.[29]

(16) In addition to the city-owned property, Carroll Engineering was charged to study adjacent lands aggregating 43 acres and including the lands of Zaferes and A. Duie Pyle.[30] The total tract area studied by Carroll Engineering was 153 acres.[31]

(17) The resulting feasibility study, dated February 17, 1999, was presented to city council during an executive session conducted on February 22, 1999.[32]

(18) The February 17, 1999 Carroll Engineering feasibility study concluded that development of the 153-acre tract studied "can accommodate commercial and

27. Janssen pp. 18-19.

28. Rolston p. 11.

29. Janssen p. 149; Green p. 71.

30. Chertok p. 10.

31. Exhibit "Saha-2" at p. C004621. Green p. 58. Exhibit "Saha-3" depicts the city-owned property and additional 43 acres constituting the scope of the Carroll Engineering feasibility study area as demarcated with a pink perimeter outline and the optional additional properties (being those denominated on the exhibit as Snyder, Hanna, Denbraven, Horwitz, Conrail, and Sheeder) recommended by the feasibility study and described below in the text are demarcated with a green outline. Chertok p. 9; Rolston pp. 26-28.

32. See exhibit "C-30"; executive session agenda at p. C005964.

recreational land uses, subject to adherence to zoning requirements and state and local permitting. However, the 153-acre site may not have enough land acreage to accommodate a full golf course and commercial uses."[33]

(19) Appended to the Carroll Engineering feasibility study are a series of land use plans which include the designation of "optional additional parcels" consisting of tax parcels nos. 38-3-23.1, and 38-3-23.2;[34] 38-3-23.2.A;[35] 38-3-23.2B;[36] 38-3-24;[37] 38-3-25;[38] and 38-3-26.[39]

(20) The aggregate area of the optional additional parcels designated in the Carroll Engineering feasibility study's land use plans is 53.155 acres which, when added to the initial study area of 153 acres yielded a recommended area of 206.153 acres.

(21) By resolution no. 99-6, adopted during a regularly scheduled public meeting held on March 8, 1999, city council "authorize[d] the city manager to act on behalf of the city in investigating, negotiating, and purchasing property for the benefit of the city, up to a maximum total expenditure of $800,000."[40]

(22) By an evolving memorandum dated March 8, 22, and 29, 1999, Paul G. Janssen, the city manager, informed

---

33. See exhibit "Saha-2" at p. C004631.

34. Lands of Christopher and Kathryn Snyder constituting 23.2 acres.

35. Lands of Gary and Marie Hanna constituting 1.965 acres.

36. Lands of David and Linda Denbraven constituting 1.68 acres.

37. Lands of Ezril and Gertrude Horwitz constituting 6.82 acres.

38. Lands of Wilmington and Northern Railroad constituting 9.51 acres.

39. Lands of Everett and Mary Sheeder constituting 9.98 acres.

40. See exhibit "C-17"; resolution 99-6 of 1999.

city council of "the next stage of [the] information found in" the Carroll Engineering feasibility study. Mr. Janssen advised that the city must "acquire an additional 50 acres to truly look at a real opportunity for a golf course."[41]

(23) The March 1999 memorandum then "details six parcels which are adjacent to the city owned land and conducive to use with the golf course . . . ." The parcels listed in the chart that follows in the memorandum possess an aggregate area of 60.60 acres and include the lands of Christopher and Kathryn Snyder (vendees of the Chriswell property[42]); A. Duie Pyle (15.7 acres included in the initial 153-acre study tract); Zafries [sic], Ursini, and Phillips (17.3 acres included in the initial 153-acre study tract); Everet [sic] Sheeder, and Gertrude Horowitz [sic].[43]

(24) In a narrative paragraph following the six-parcel chart, appears the following: "In addition parcel 38-2-29-1 [sic] has 38.2 [sic][44] acres adjacent to the A. Duie Pyle site."[45] This reference, apparently intended to refer to that portion of the lands of Richard and Nancy Saha located in Valley Township, is the first documentary reference in this extensive record to condemnation of the condemnees' property.

(25) On the agenda of the regularly scheduled public meeting of city council conducted on April 12, 1999, is the first reading of an ordinance entitled "An ordinance

---

41. See exhibit "Saha-4"; the March 1999 memorandum at p. C006159.

42. Chertok pp. 60-61.

43. *Id.*

44. Janssen p. 179.

45. *Id.*

exercising the power of eminent domain and condemn-
ing certain properties for recreation facilities and park-
lands relative to construction of a golf course and re-
lated recreation places."[46] Appended to the text of the
ordinance is a plan showing the properties to be con-
demned.[47] The plan appears to be derived from the land
use plans appended to the Carroll Engineering feasibil-
ity study.[48] Each of the optional additional parcels de-
picted in the land use plans is also so designated and
proposed for condemnation. The ordinance exhibit (and,
correspondingly, the text) differs from the land use plans
only in the depiction of the condemnees' property in
Valley Township and the designation thereof as proposed
for condemnation. A note in the text of the ordinance
expresses the intent of city council to spare the homes
located on other properties to be condemned. No such
intent is expressed with respect to the home, barn, and
other outbuildings located on the condemnees' lands, the
whole of which in Valley Township are proposed for
condemnation.[49]

(26) The city solicitor's certification affixed to the April
12, 1999 ordinance indicates "that this is a true and cor-
rect copy of the ordinance first considered by the City of

---

46. See exhibit "Saha-5A"; the April 12, 1999 ordinance at p.
C004608.

47. *Id.* at p. C004610.

48. Alternatively, the ordinance plan and feasibility study exhibits
may be derived from the same source survey or base map.

49. The portion of condemnees contiguous property located in West
Caln Township was not included in the April 12, 1999 proposed con-
demnation ordinance. Exhibit "Saha-5"; Chertok pp. 66-67. The Sahas'
home and barns and paddock area as well as their source of potable
water and septic field are located in Valley Township.

Coatesville at its regularly scheduled meeting of April 12, 1999, and which is scheduled for a second reading at the city council's regularly scheduled meeting of April 26, 1999." [50]

(27) A photocopy of the April 12, 1999 ordinance was sent to the condemnees under cover of the city solicitor's April 21, 1999 letter. [51]

(28) The second reading of the April 12, 1999 ordinance did not occur as scheduled. [52]

(29) Instead, city council, assertedly in response to the sentiment expressed by citizens during and following the April 12, 1999 session, determined to solicit additional expert consultation and to reconsider the project following receipt thereof. [53]

(30) Thereafter, the city manager prepared and transmitted to more than one dozen consulting firms, a request for proposals to conduct an economic feasibility and marketing study of the contemplated regional recreation center. [54]

---

50. *Id.* at p. C004608.

51. See exhibit "Saha-6."

52. See exhibit "C-32"; city council agenda for May 24, 1999 at p. C003745: "Please note: The second reading of the ordinance the [sic] acquire land by eminent domain has been tabled and is not scheduled for consideration at this time to enable staff to analyze and report on the results of the town meeting on May 1, 1999."

53. Janssen p. 21 ("Following the initial adoption on first reading of the ordinance for eminent domain in 1999 council took to heart the request made by individuals . . . that they should go out and get more detail [sic] advise [sic] as to the economics of the site . . . ."); p. 278.

54. Janssen p. 22.

(31) In about May 1999,[55] Thomas Comitta Associates Inc., as the city's consulting professional land planners, prepared an undated document entitled "Revitalization initiatives—City of Coatesville" which depicts by map the locations of 36 designated initiative projects of which the "regional recreation center" is no. 28.[56]

(32) The revitalization initiatives plan, admitted as exhibit "Saha-41," depicts a partial condemnation of the Saha property for golf-related uses and the exception from the condemnation of a parcel possessing frontage on Mount Airy Road and with an area of about 14.5 acres.[57]

(33) The manager, city solicitor, and the city's special counsel participated in the interviews of those firms which responded to the request for proposals concerning a supplemental economic feasibility and marketing study of the proposed regional recreational complex.[58]

(34) Ultimately, a recommendation was made to city council that Insignia/ESG[59] be retained for this purpose and council accepted this recommendation.[60]

---

55. Green p. 38.

56. See exhibit "Saha-41" (p. C006305).

57. See exhibit "Saha-21."

58. Janssen p. 22.

59. The following description of the company appears at Insignia/ESG's website: URL—http://www.insigniaesg.com/:

"Insignia/ESG Inc. is one of the nation's leading commercial real estate services providers, with comprehensive brokerage, property management, facilities management, consulting, investment sales and debt placement operations in 48 premier U.S. markets. Insignia/ESG also delivers advanced commercial real estate services in the United Kingdom, Italy, Germany, Belgium, Holland and Japan.

"In the U.S., Insignia/ESG provides services for a property portfolio spanning more than 230 million square feet. Insignia/ESG is a subsidiary of Insignia Financial Group Inc., a publicly traded company listed on the New York Stock Exchange."

60. Janssen p. 23.

(35) The study subsequently submitted by Insignia ESG, entitled: "City of Coatesville proposed regional recreation complex" (Insignia report) prepared for Herbert Bass, Esquire (the city's special counsel herein) and dated March 22, 2000, was presented to council sometime thereafter in the spring of 2000 by one Chris Charnas who does not appear to be identified in the report itself.[61]

(36) The Insignia report considers the economic feasibility of a golf course, multiplex theater, and hotel/conference center and concludes:

"(a) That 'an opportunity exists to create a first-class municipally-owned golf course in Coatesville. The land for the golf course is ideally suited for a fun yet chal-

---

61. Janssen pp. 163-64. However, Mr. Charnas' curriculum vitae was admitted as exhibit "C-1" and identifies him as a director of financial services for Cushman & Wakefield of Illinois Inc.; a specialist in the "golf course business" with experience in "feasibility, sales, development, financing, valuation and consulting on public, private, and municipal golf courses . . . on projects all across the United States [and in] all phases of the development process from conception to grand opening to operations. Prior to starting Cushman & Wakefield's Golf Group in September 2000, Mr. Charnas founded Insignia ESG's Golf Group, and was managing director there until September of 2000." Exhibit "C-1"; we find Mr. Charnas' expertise to be sufficiently established. The Insignia ESG report begins with the following found at the foot of the introductory listing of the table of contents: "All information contained in this report is from sources deemed reliable, but no warranty or representation is made as to the accuracy thereof and same is submitted subject to errors and omissions." Insignia report, exhibit "Saha-23" at unnumbered p. C004431. In the absence of explanatory testimony, it is not at all clear following this broad disclaimer that any weight can properly be given to the substance of the report.

Nevertheless, since the effect of this disclaimer has not been briefed by the parties, we have, for these purposes, disregarded it.

lenging layout.' Chester County can support a municipal golf course in Coatesville with weekend greens fees of $46.50 for non-residents and $41.50 for residents.[62] A maximum investment of $5 million is recommended. The golf course will be able to support bond payments on the investment in year three of operations. Net income in the third year of operation of the golf course is projected to be $545,000.[63]

"(b) That the contemplated multiplex theater project is 'deemed feasible at this time.' Preference is given to a private operator of between nine and 12 auditoriums (37,500-50,000 square feet) with between 475 and 650 parking spaces on between 8.69 and 12.07 acres to pay to the city as lessor from $12 to $19.75 per square foot in a 'triple net' lease.[64]

"(c) That the city should 'proceed with the development of a full-service, group meetings-oriented hotel' by 'attract[ing] a third-party hotel developer to enter into a long-term ground lease to build and own the project,' which 'should be affiliated with a first-class hotel chain' and 'in the 150-250 room [125,000-200,000 square feet on five to 10 acres] range, with adequate meeting, recreational and restaurant space . . . [and] designed and managed in such a way as to integrate with the golf course

---

62. "Resident rounds"; that is, rounds of golf "played by persons who reside in the City of Coatesville" are estimated in the Insignia report to "account for 10 percent of all 18-hole rounds." Exhibit "Saha-23" at unnumbered p. C004496. We will return to this estimate in our discussion of the "public interest" requirement for lawful condemnations.

63. Insignia report, exhibit "Saha-23" at unnumbered p. C004503.

64. Insignia report, exhibit "Saha-23" at unnumbered p. C00454C.

operation.'[65] Various financial projections are offered including a projected ground rent for a 250-room hotel of 2 percent of hotel revenue or $455,486 in the fourth year of operation.[66]

"(d) That a two-rink, 65,000 to 70,000 square foot ice-skating facility 'incorporat[ing] a retail store, pro shop, party room, locker rooms, hockey clinics, and figure skating instruction, age group hockey leagues, competitive figure skating, game room, video arcade, limited stadium seating, fitness center, restaurant and beverage area, hockey and figure skating camps and large meeting rooms' would be feasible and should be developed by the city at 'a typical construction and fit-out cost of approximately $8 million.'[67]

"(e) That the unserved regional population would be sufficient to support a 40-lane bowling facility of approximately 40,000 square feet which would 'be feasible at this time under the current competitive market.'[68]

"(f) That the proposed regional recreation complex would provide 'many employment opportunities for the citizens of Coatesville' and 'an additional influx of money . . . into the public sector,' the 'economic impetus' of which 'is important to the revitalization of the City of Coatesville . . . . In conclusion, we believe that develop-

65. See Insignia report, exhibit "Saha-23" at unnumbered p. C004559.

66. See Insignia report, exhibit "Saha-23" at unnumbered p. C004563.

67. Insignia report exhibit "Saha-23" at unnumbered p. C004567.

68. Insignia report, exhibit "Saha-23" at unnumbered p. C004568.

ment of the regional recreational complex will provide a significant economic engine to revitalize this area.' " [69]

(37) The city's finance director, Beth Butch, performed an independent confirmation of the internal consistency of the calculations contained in the Insignia report. [70]

(38) In September 1999, [71] Carroll Engineering prepared an engineered drawing of the Saha condemnation including the depiction of a dimensioned, excepted parcel materially similar in configuration to that depicted in the revitalization initiatives plan [72] and indicating the area of the excepted parcel to be 14.5 acres. [73]

(39) Under cover of a letter dated October 21, 1999, [74] the city's solicitor transmitted to the Sahas' counsel a

69. Insignia report, exhibit "Saha-23" at unnumbered p. C004569. The "Grand Opening" of the regional recreational facility is projected by the report for fall 2002. Insignia report, exhibit "Saha-23" at unnumbered p. C004454.

70. Janssen pp. 26-27.

71. Record page C005342.

72. Compare exhibits "Saha-21" and "Saha-41."

73. Exhibit "Saha-21" (handwritten label).

74. Admitted into the record of these proceedings as exhibit "Saha-11" (p. C005253). The attachment to exhibit "Saha-11" appears to be materially similar to exhibit "Saha-22" except that the former ("Saha-11" attachment), contains the legend "Coatesville golf course and recreational facilities" missing from "Saha-22" which also does not include the "Draft" stamp; and "Saha-22" appears to be the original, color document. Both plans are undated. As an aside, we were mystified by the frequency with which undated documents, including engineered plans, appear in this record. In our experience, such documents are universally identified by their date of preparation, revision, and issuance. A majority of the plans in this record contain no dates whatsoever; a practice we find to be remarkable. Mr. Janssen testified that exhibit "Saha-22" was prepared by Carroll Engineering in June or July 1999, sometime after the first reading on April 12, 1999. This chronology raises unresolved issues, however. For example, it is un-

"draft copy of the development plan" [75] which depicted the condemnation and use of about seven acres [76] of the Sahas' property located in the extreme north and north-eastern portion thereof. The draft development plan was mailed to each of the affected landowners in order to "open negotiations." [77]

(40) The portion of the Sahas' lands shown in the draft development plan as part of the regional recreational complex and, therefore, to be acquired for that purpose is significantly smaller than the condemnation parcel as depicted in the May 1999 revitalization initiatives plan. [78]

(41) The development plan described in the preceding paragraphs and admitted into the record of these proceedings as, inter alia, exhibit "Saha-22" remained the public expression of city council's intentions with re-

---

explained on this record why, in October 1999, the city solicitor would forward to the Sahas a plan materially similar to exhibit "Saha-22" prepared some four months earlier and showing the use of only about seven acres of the Saha property when the plan then under consideration was exhibit "Saha-21" prepared the previous month and depicting the use of about 33 acres of the Saha property (47.5-acre gross tract area minus 14.5-acre excepted tract as shown on exhibit "Saha-21").

75. See exhibit "Saha-11" at p. 2; exhibit "Saha-12" (tax map excerpt with information from "Saha-11" superimposed thereon).

76. The minutes of the public meeting of city council conducted on November 8, 1999, include the following account of representations then made by the city's solicitor: "Mr. Carnes stated that new plans on the regional recreation center were sent to Mr. Saha's attorney. The plans now show seven acres of the Saha property." Exhibit "Saha-13." In fact, the plan depicts the whole of the Saha property with about seven acres thereof shown to be used as and for the recreation facility.

77. Janssen p. 187.

78. Compare exhibits "Saha-22" and "Saha-41."

spect to the Saha property until at least as late as June 19, 2000,[79] and was presented as the plan of development by city council during the course of a public meeting conducted on that date.[80]

(42) By letter dated November 16, 1999, the condemnees, by their counsel, informed the city that they were not interested in negotiating the sale of their lands.[81]

(43) The feasibility and marketing study prepared by Insignia/ESG was issued on March 22, 2000,[82] and was presented to city council shortly thereafter.

(44) Immediately following the issuance of the Insignia/ESG study, and for the purpose of "meshing . . . the Insignia report with the needs of the First Tee program"[83] Carroll Engineering prepared an undated, letter-sized

---

79. Notwithstanding the intervening preparation in September 1999 of exhibit "Saha-21" which depicted the use of nearly five times as much of the Sahas' lands for the city's purposes and city council's receipt of advice beginning in 1999 that the golf course layout depicted schematically thereon was "too tight" thereby creating significant issues of playability, safety, and economic success. Janssen pp. 192-96.

80. Council president Hines answered in the affirmative to the following inquiry put to him by the Sahas' counsel during his deposition on February 1, 2000: "As a matter of fact, isn't it correct that exhibit [Saha-] 22, which is on the board, this was what was shown to the public on the June 19 public meeting between the first and second reading of the condemnation ordinance [no. 1132-2000]? A: Yes. Q: Is that correct? A: That's correct. Yes." Hines p. 69.

81. See exhibit "C-35" at p. C005207.

82. See exhibit "Saha-23" at unnumbered p. C004430.

83. Janssen p. 208. The First Tee program is an initiative of the World Golf Foundation (a collaboration of the world's major golf organizations including the PGA Tour, U.S. Golf Association, the Ladies Professional Golf Association, the Augusta National Golf Club, and others) designed to increase the availability of golf particularly to

graphic entitled "Coatesville schematic master plan"[84] which is limited in scope to the Saha and adjacent properties located north of the Route 30 by-pass, south of Route 340, and lying between Mount Airy Road and the West Brandywine Creek. This plan depicts the Saha property as developed for golf use together with parking for commercial uses located on adjacent property. The excepted parcel depicted on exhibit "C-4," the schematic master plan, is consistent with that shown on exhibits "Saha-21" and "Saha-41"; that is, an excepted parcel about 14.5 acres in area resulting in a suggested condemnation of about 33 acres or more than 4.7 times the area to be condemned as depicted in exhibits "Saha-11" and "Saha-22."

(45) The record is unclear as to whether city council ever received or reviewed exhibit "C-4."[85]

(46) Also around this time, in April 2000, Carroll Engineering prepared for job no. 99-8501, an engineered plan, dated April 4, 2000; approximately 36" by 48" in dimensions and drawn to the scale of one inch equals 200 feet; entitled "schematic master plan."[86] This plan depicts the whole of the Saha property developed for golf use (a series of par three holes), a "family entertainment center" located in West Caln Township, and park-

---

youth of low income families and limited means. Golf facilities which associate themselves with the First Tee program are eligible for substantial savings in a range of goods and services needed by the facility. See exhibit "C-15"; (First Tee program brochure); Janssen pp. 27-52.

84. See exhibit "C-4."
85. Janssen p. 210.
86. See exhibit "C-7."

ing for a 40-lane bowling facility and a two-rink ice-skating rink located on adjacent property. No excepted parcel is depicted on this plan.

(47) Admitted as exhibit "C-5" [87] is an oversized,[88] assembled engineered drawing, neither dated nor titled and displaying no identifying legend of any kind and depicting, at a scale of approximately one inch to 100 feet, the contiguous lands, including those of the Sahas, on which the city wishes to develop the regional recreational facility. This plan contains the outlines of proposed structures and other improvements including access drives and parking areas together with handwritten labels, arrows, and other markings all superimposed over the engineered "blueprint." Golf tees, fairways, greens, and pins together with their distances and par designation are also shown by means of drafting symbols superimposed on the plan. The Saha property is depicted in this plan developed only for parking at the periphery for uses located on adjacent property—suggesting a condemnation along the lines of the seven-acre taking depicted in exhibits "Saha-11" and "Saha-22." Also shown in tentative markings suggesting a later addition without the benefit of drafting instruments is the perimeter of what appears to be a proposed excepted parcel. Neither area nor dimension figures are indicated but the parcel appears to be larger than the six-acre exception tract no. 1[89]

---

87. Record page C006350.

88. Approximately 63" by 63".

89. So denominated on the June 5, 2000 condemnation plot appended as exhibit "F" to ordinance no. 1132-2000 and the August 2, 2000 declaration of taking. See exhibit "C-34."

but smaller than the 14.5-acre excepted parcel shown in exhibits "Saha-21" and "Saha-41." In addition, the excepted parcel shown in exhibit "C-5" possesses about 80 feet of frontage on Mount Airy Road.

(48) The record also includes exhibit "C-8," prepared by Carroll Engineering, undated, entitled "Land area requirement plan—total acres: 233.23 acres; and depicting the location, boundaries, adjacent roadways, tax parcel designators, and, in most instances, the record title owner of each of the properties made the subject of ordinance no. 1132-2000.[90] Proposed uses and their approximate area requirements are listed in a table on the plan styled "Land area requirements table" but are not located on the tract. The whole of the Saha property, without reference to an excepted parcel, is shown as part of the assemblage.[91]

(49) The aggregate of all of the area requirements for the specified land uses shown in the table is a range from 205.69 to 259.07 acres.[92] This does not account for lands devoted to multiple uses. For example, no reason is given why yard and building setback areas for some uses[93] could not be shared or designed to encompass a portion of the outdoor, open air requirements related to other uses.[94] In the absence of such analysis, we give little weight to this exhibit.

---

90. See exhibit "C-8" record page C006346.

91. *Id.*

92. *Id.* See also, Janssen pp. 214-15.

93. For example, the hotel/conference center, multiplex theater, family entertainment center, or ice-skating or bowling facilities.

94. For example, the 18-hole golf course, or the golf training facility.

(50) Mr. Janssen testified that exhibit "C-8" was prepared sometime during the period from the beginning of April through mid-June 2000 and prior to enactment of ordinance no. 112-2000 on June 26, 2000.[95]

(51) During an executive session of city council held on June 5, 2000, Stephon Hines, president of city council, called for a special meeting to be conducted on Tuesday, June 13, 2000, at 5 p.m. for the purpose of conducting the first reading of the ordinance.[96]

(52) City council also placed the issue of the proposed ordinance on its agenda and introduced it at the regular meeting on June 12, 2000, at which time 50 to 75 persons other than city council and staff were in attendance and 17 of the attendees spoke with respect to the ordinance.

(53) John S. Carnes Jr., Esquire, solicitor for the city, prepared the notice for the special meeting.[97]

(54) On June 8, 2000, Mr. Carnes faxed the notice to the *Daily Local News,* which published it on June 9, 2000.[98] In addition, Mr. Carnes also placed an advertisement in the *Daily Local News,* a newspaper of general circulation in Chester County, setting forth the language of the ordinance that would be considered at the special meeting.[99]

---

95. Janssen p. 213.

96. See affidavit of Hines, exhibit "C-36"; affidavit of Janssen, exhibit "C-37."

97. See Newlin, p. 10; Carnes, pp. 3, 6-10.

98. See Carnes, pp. 7-11.

99. See Carnes, pp. 3, 6-10. Exhibits "C-21A," "C-21B" and "C-21C" constitute the ordinance and the official advertised notice of the special meeting, which were faxed to the *Daily Local News* on

(55) Frances Newlin, as executive secretary to the city manager, was responsible for posting the notice of the special meeting and did so at around noon on June 12, 2000, by affixing both notices prepared by Mr. Carnes, with transparent tape, to the glass panel in the door at the main entrance to city hall, the usual place for the posting of such notices, all as per the telephone instructions of Mr. Carnes.[100]

(56) Approximately 50 to 75 people, other than city council and staff, attended the special meeting and 15 of these attendees including eight of whom had not spoken at the regular meeting on April 12, 2000, gave their views concerning the proposed ordinance.[101]

(57) On June 26, 2000, city council adopted ordinance no. 1132 of 2000, entitled "An ordinance authorizing the acquisition by amicable negotiation or by the exercise of eminent domain of certain properties and property interests for use as a public golf course and related facilities and for other recreational purposes." [102]

(58) The Saha property is one of the properties identified for acquisition in the ordinance.

---

June 8, 2000. Exhibit "C-22" constitutes the proof of publication of the notice in the newspaper. See Carnes, pp. 8-11.

100. See Newlin, pp. 7-9, 14; Carnes pp. 18-19. Council member Green observed the posted notice when she entered city hall at about 4:30 p.m. on June 13, 2000. Green p. 216. A photograph of the main (western) entrance into city hall showing the glass doors and the glass panels on either side was admitted into the record as exhibit "Saha-52."

101. See Newlin, pp. 36-40; exhibit "C-23" at Bates-stamped numbers C001799-C001801.

102. See exhibits "Saha-18," "C-3" (exhibit "A"); Janssen pp. 58-60.

(59) Other properties identified for acquisition in ordinance no. 1132-2000 include (1) 15.7 acres of A. Duie Pyle Inc. designated as tax parcel no. 16-1-40.1;[103] (2) 7 acres of Ezril and Gertrude Horwitz designated as tax parcel no. 38-3-24;[104] (3) 9.1 acres of Everett and Mary Sheeder designated as tax parcel no. 38-6-36;[105] (4) 23.2 acres of Christopher and Kathryn Snyder designated as tax parcels nos. 38-2-23.1 and 38-2-23.2;[106] (5) 19.2 acres of Dimitrius Zaferes, Joseph Ursini, and Paul Phillips designated as tax parcels nos. 16-1-40 and 16-1-40.3;[107] (6) a .6492 portion of the 1.9653-acre property of Gary and Marie[108] Hanna designated as tax parcel no. 38-

---

103. Ordinance no. 1132-2000 at p. 2 admitted into evidence, inter alia, as exhibit "Saha-18." See also, exhibit "C-23" at p. C001842. At the time of his testimony on April 11, 2001, Mr. Janssen represented that with respect to this property "we are simply working through the process of a phase two environmental [assessment] to make a final cleanup on the property, and we have the framework of the agreement on that property also." Janssen p. 135.

104. *Id.* Mr. Janssen testified that a declaration of taking has been filed with respect to the Horwitz property and that the period for the interposition of preliminary objections pursuant to Eminent Domain Code §406, 26 P.S. §1-406 expired without such a filing. Janssen p. 134.

105. *Id.* Mr. Janssen represented that the Sheeder property has been purchased by the city for a purchase price of $30,000. Janssen p. 134.

106. *Id.* The Snyder property was purchased by the city for a purchase price of $350,000. Janssen p. 134.

107. Ordinance no. 1132-2000 at p. 3 admitted into evidence, inter alia, as exhibit "Saha-18." See also, exhibit "C-23" at p. C001843. With respect to the Zaferes, Ursini, Phillips property, Mr. Janssen represented that the city "is in its final stage of negotiations. We are at the point where we're prepared to execute the agreement with them." Janssen p. 135.

108. Referred to as "Maria" in the June 6, 2000 condemnation plot. See exhibit "B" to ordinance no. 1132-2000 admitted into evidence,

2-23.2A; (7)[109] a .1645-acre portion of the 1.6841-acre property of David and Linda Denbraven[110] designated as tax parcel no. 38-2-23.2B;[111] and (8)[112] 12 acres[113] owned (and/or abandoned) by the Brandywine Railroad Com-

---

inter alia, as exhibit "C-23" at p. C001845. Mr. Janssen described the negotiations with the Hannas in the following terms: "We have arrived at a verbal agreement and a written document with the Hannas, which has not been executed, only because the timing isn't appropriate for his work with his mortgage company, but we have the agreement in place." Janssen p. 135.

109. Referred to incorrectly as "(6)" in p. 3 of ordinance no. 1132-2000. See, inter alia, exhibit "C-23" at p. C001843.

110. Also referred to as Linda McCreary-Denbraven.

111. *Id.* See exhibit "D" to ordinance no. 1132-2000 found, inter alia, at exhibit "C-23" p. C001850. At the time of his deposition on April 11, 2001, the Denbraven property was "the only property that we have not dealt with and have not made any decision as to the avenue to go . . . ." Janssen p. 135. In the litigation commenced by Valley Township and docketed to no. 01-09098 in which we have entered an adjudication simultaneously herewith, we learned that on September 14, 2001, the city filed a declaration of taking which was docketed to no. 01-07598 on the docket of this court thereby condemning that portion of the Denbraven property described in the text.

112. For the purposes of ordinance no. 1132-2000, the Saha condemnation is designated as no. (8) and the railroad property described in the text is designated as no. (9).

113. *Id.* With reference to the railroad property, Mr. Janssen summarized the complex and as yet unresolved issues of present ownership. Janssen p. 136. The text of ordinance no. 1132-2000 describes the condemned property as "12 acres, more or less . . . more generally [sic] described in . . . exhibit 'H.' " The said exhibit "H" (admitted, inter alia, as exhibit "C-23" p. C001859), however, indicates the total gross parcel area of tax parcel no. 38-3-25 to be 9.51 acres and a 60-foot wide railroad right-of-way proceeding in a northerly direction therefrom to Kings Highway (Route 340) in West Caln Township is indicated to have a total area of 5.88 acres, all of which is designated for condemnation. The origin of the 12-acre figure is unclear on this record.

pany Inc.; the Consolidated Rail Corporation; and/or the Norfolk Southern Railroad and designated as tax parcel no. 38-3-25.[114]

(60) A summary of the properties authorized for acquisition by ordinance no. 1132-2000 is also admitted into this record as exhibit "Saha-43" in which the aggregate area of all of the properties (including the 110 acres previously acquired and the 41.5466 Saha condemnation[115]) is calculated to be 233.1356 acres.

(61) About 160 acres are required for a desirable 18-hole golf course. Since about 30 acres of the overall tract are unusable for this purpose on account of topography, narrowness, and adjacent uses, a gross tract area of 190 acres would be required.[116]

(62) About 30 acres are required for the golf training facility including a building for indoor functions, the nine-hole executive course and a driving range.[117] This record does not support the conclusion that the 30 acres deemed unusable for construction of the 18-hole, 6,500-yard, golf course are also, in whole or in part, unusable for location of the golf training facility.

(63) Following enactment of ordinance no. 1132-2000, a sketch plan, dated July 26, 2000, was prepared under the auspices of the John Cooke Golf Design Group; en-

---

114. *Id.* See exhibit "H" to ordinance no. 1132-2000.

115. A gross area of 47.5466 acres less the 6-acre area of exception tract no. 1. See exhibit "Saha-43."

116. Janssen pp. 155-59 (describing the consistent advice of Russell Dunlevy P.E. of Carroll Engineering; Chris Charnas of Insignia/ESG; and Galin Scherenberg of the John Cooke Design Group).

117. Janssen pp. 160, 166.

titled "First Tee of Coatesville—conceptual" and depicting the use of all of the Sahas' lands excepting only exception tract no. 1 for golf-related activities including a bi-directional driving range and holes five through nine of a nine-hole, executive (par three) golf course.[118] This July 26, 2000 plan is the earliest document of record depicting the use proposed to be made of the lands condemned from the Sahas.

(64) On August 2, 2000, the city filed a declaration of taking, thereby condemning a portion of the Saha property, as authorized by the ordinance. No other property or property interest was condemned pursuant to this declaration of taking.[119]

(65) Paragraph six of the declaration of taking describes the purpose for which the condemnor has exercised its power and is as follows: "[t]he property has been condemned by the City of Coatesville for the purposes of creating and establishing a public golf course and related facilities and other recreational uses comprising a regional, family, recreational complex, as provided for in the ordinance." [120]

(66) By official statement dated November 21, 2000, the city announced its series of 2000, general obligation bonds in the amount of $5 million.[121]

(67) The official statement describes "the project" which is the "purpose of the issue" in the following terms: "The city is moving forward on its regional, family, rec-

---

118. See exhibit "Saha-40."
119. See declaration of taking, exhibit "C-33."
120. See exhibit "C-33" at 6. (Not Bates-stamped.)
121. See exhibit "C-20"; the official statement. (Not Bates-stamped.)

reational complex which will provide recreational facilities to southwestern Chester County. Located on 210 acres of land at the intersection of Routes 30 and 82, the complex design is based on an in-depth market research study of the region's recreational needs. This research shows a great need for such a complex in this area. Indoor recreational facilities will include batting cages, a two-rink ice-skating facility, bowling center and multiplex theater. Outdoor recreational activities include an 18-hole golf course, pro golf shop, driving range, miniature golf, boating and canoeing, pitch & putt course and go-carts. Indoor and outdoor rock climbing will also be offered.[122]

"(a) Proceeds of the bonds, will specifically fund, among other things, the expenditures related to land acquisition and the golf course."

(68) Following the interposition of preliminary objections filed by the condemnees pursuant to section 406 of the Eminent Domain Code, the Act of June 22, 1964, P.L. 84, as amended, 26 P.S. §1-406 which included a challenge to the authority of the city to condemn lands for the purposes specified, an amended declaration of taking executed by Mr. Carnes as city solicitor, and seeking to amend ¶6 of the initial filing so as to specify the purpose of the condemnation as the creation of "a public golf course and golf-related facilities," was filed on February 13, 2001.[123]

---

122. Exhibit "C-20" at pp. 7-8 (not Bates-stamped); see also, Janssen pp. 8-9 for a materially similar account of the projected land uses.

123. See amended declaration of taking, exhibit "C-34."

(69) To the extent that the zoning regulations of Valley Township were consulted by Messrs. Janssen and/or Dunlevy prior to October 2000, those regulations are found in exhibit "Saha-33" including the zoning map admitted as exhibit "Saha-33A"; and, with respect to consultations, if any, made prior thereto, the regulations are found in exhibit "C-16" [124] including the Valley Township zoning map identified as exhibit "C-16" pages C006558, C006559, and C006560.[125]

(70) The parcel excepted from the Saha condemnation, designated (and occasionally referred to hereinbelow) as "exception tract no. 1" on, inter alia, the condemnation plot appended to ordinance no. 1132-2000 as exhibit "F" and to the amended declaration of taking filed on or about February 13, 2001, as exhibit "C," is shown with an area of 261,360 square feet or precisely six times the area of one acre (43,560 square feet).

(71) Exception tract no. 1 possesses no public road frontage,[126] having road access only by means of a non-exclusive easement, 20 feet in width.[127]

(72) Exception tract no. 1 does not include within its boundary either the Sahas' existing source of potable water[128] or the Sahas' on-lot, subsurface, sanitary sewage disposal facility.

---

124. Janssen pp. 81-88, 494-95.

125. Janssen p. 83.

126. Green p. 29 (stipulation); Griffith p. 112. This aspect of the factual circumstances as well as its regulatory significance are discussed in greater detail in the opinion filed simultaneously herewith in *Valley Township v. City of Coatesville,* no. 01-09098, slip op. at pp. 7-8.

127. See for example, exhibit "Saha-20."

128. Green p. 28.

(73) By document dated February 22, 2001, and styled "supplement to feasibility study" [129] Carroll Engineering reports on the investigation performed following the completion of the initial feasibility study two years earlier with respect to the Saha property and its suitability for development as part of the proposed golf course and related recreational uses. We find this document to have been prepared as a litigation document after the interposition of the instant preliminary objections and at the express direction of the city's special counsel and we accord it a weight commensurate to this origin.

(74) Additional factual findings together with citation to the record support therefor will be included in the following discussion where and as appropriate. [130]

## DISCUSSION

Article 1, Section 10 of the Pennsylvania Constitution provides, in pertinent part: "[n]or shall private property be taken or applied to public use, without authority of law and without just compensation being first made or secured." The power of the Commonwealth to acquire private property for public use is said to flow directly from its attributes as a sovereign. See *e.g., Peters v. Reading,* 321 Pa. 220, 221, 184 A. 23, 24 (1936). [131] The city's eminent domain power, in contrast, is one of express

---

129. See exhibit "C-6."

130. Janssen p. 69.

131. For a familiar statement of this theory of necessity see *Adirondack Railway Company v. People of the State of New York,* 176 U.S. 335, 20 S.Ct. 460, 44 L.Ed. 492 (1900) ("[T]he power of taxation, the police power and the power of eminent domain underlie the

delegation. Municipalities of this Commonwealth have no condemnation authority apart from or beyond that made the subject of express statutory grant.[132]

We must also begin our analysis with a discussion of the jurisprudential limits on our inquiry, limits which have been variously described as "elementary" and "well-settled." For example, in *Blumenschein v. Pittsburgh Housing Authority,* 379 Pa. 566, 109 A.2d 331 (1954), *cert. denied,* 350 U.S. 806, 76 S.Ct. 68, 100 L.Ed. 724 (1955), involving a challenge to a condemnation by the

---

constitution, and rest upon necessity, because there can be no effective government without them. They are not conferred by the constitution, but exist because the state exists, and they are essential to its existence. They are not rights reserved, but rights inherent in the state as sovereign. While they may be limited and regulated by the constitution, they exist independently of it, as a necessary attribute of sovereignty. They belong to the state because it is sovereign, and they are a necessity of government. The state cannot surrender them, because it cannot surrender a sovereign power. It cannot be a state without them. They are as enduring and indestructible as the state itself . . . .") (citations omitted); cited and quoted in part in *Condemnation of 110 Washington Street, Borough of Conshohocken,* 767 A.2d 1154, 1158 (Pa. Commw. 2001).

132. As the court wrote in *White Oak Borough Authority Appeal,* 372 Pa. 424, 427, 93 A.2d 437, 438 (1953):

"Neither authorities nor municipalities are sovereigns; they have no original or inherent or fundamental powers of sovereignty or of legislation; they have only the power and authority granted them by enabling statutory legislation."

See also, the authorities cited below for the proposition that statutory provisions conferring the power of eminent domain are in derogation of the right to own and hold private property and, therefore, must be strictly construed so as to guard against an unauthorized extension of the power.

housing authority of the City of Pittsburgh as part of a two-year program for the development of 5,000 dwelling units of low-rent public housing, the court wrote the following:

"By a host of authorities in our own and other jurisdictions it has been established as an elementary principle of law that courts will not review the actions of governmental bodies or administrative tribunals involving acts of discretion, in the absence of bad faith, fraud, capricious action or abuse of power; they will not inquire into the wisdom of such actions or into the details of the manner adopted to carry them into execution. It is true that the mere possession of discretionary power by an administrative body does not make it wholly immune from judicial review, but the scope of that review is limited to the determination of whether there has been a manifest and flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions. That the court might have a different opinion or judgment in regard to the action of the agency is not a sufficient ground for interference; *judicial* discretion may not be substituted for *administrative* discretion." *Id.* at 572-73, 109 A.2d at 334-35. (footnotes omitted) (emphasis in original)

To the same effect, see *Faranda Appeal,* 420 Pa. 295, 300, 216 A.2d 769, 771 (1966). In *Eways v. Board of Road Supervisors,* 422 Pa. 169, 171, 220 A.2d 840, 841 (1966), the court repeated "the well-settled proposition that in the absence of bad faith, fraud, capricious conduct or abuse of power, courts will not interfere with the acts of governmental or administrative bodies involving the exercise of discretion. *Faranda Appeal,* 420 Pa. 295,

300, 216 A.2d 769, 771-72 (1966); *Hyam v. Upper Montgomery Joint Authority,* 399 Pa. 446, 455-56, 160 A.2d 539, 545, *cert. denied,* 364 U.S. 288, 81 S.Ct. 50 (1960); *Eways v. Reading Parking Authority,* 385 Pa. 592, 597, 124 A.2d 92, 94-95 (1956); *Blumenschein v. Pittsburgh Housing Authority,* 379 Pa. 566, 572-74, 109 A.2d 331, 334-35 (1954), *cert. denied,* 350 U.S. 806, 76 S.Ct. 68 (1955). The wisdom of such action or the details of the manner adopted to carry them into effect are matters into which courts will not inquire."

It is equally well-established that "preliminary objections constitute the *exclusive method* of challenging condemnation proceedings under the new Eminent Domain Code . . . *Mahan v. Lower Merion Township,* 418 Pa. 558, 212 A.2d 217 [(1965)]." *Faranda Appeal,* 420 Pa. 295, 297, 216 A.2d 769, 770 (1966). (emphasis in original)

"Preliminary objections in the context of eminent domain actions serve a very different purpose than preliminary objections filed in other civil actions under the Rules of Civil Procedure. . . . In eminent domain cases, preliminary objections under [Eminent Domain Code] section 406[133] serve a broader purpose and are intended as a procedure to resolve expeditiously the factual and legal challenges to the declaration of taking before the parties move to the second distinct proceeding for determining damages. . . . Section 406(e) of the Eminent Domain Code, 26 P.S. §1-406(e), provides that the trial court should promptly determine all preliminary objections and make the appropriate orders and that '[i]f an issue of fact

133. 26 P.S. §1-406.

is raised, the court shall take evidence by deposition or otherwise.' " *North Penn Water Authority v. A Certain Parcel of Land,* 168 Pa. Commw. 477, 485-86, 650 A.2d 1197, 1201 (1994). (citations omitted)

Our "clear and express duty" is to promptly determine all of the preliminary objections here interposed by the condemnees (Eminent Domain Code §406(e), 26 P.S. §1-406(e); see *Pittsburgh School District Condemnation Case,* 430 Pa. 566, 575, 244 A.2d 42, 46 (1968)); a task that will necessarily involve an extended discussion in the light of the sheer number of objections raised and the breadth and complexity of the evidentiary record.

In this regard, it must be presumed that the city performed its duties in good faith, *Washington Park Inc. Appeal,* 425 Pa. 349, 229 A.2d 1 (1967), and the Sahas' burden of proving fraud or abuse of discretion is a heavy one. *Pittsburgh School District Condemnation Case,* 430 Pa. 566, 575, 244 A.2d 42, 46 (1968). At the same time, however, statutory provisions conferring the power of eminent domain are in derogation of the right to own and hold private property and, therefore, must be strictly construed so as to guard against an unauthorized extension of the power. *Pittsburgh School District Condemnation Case,* 430 Pa. 566, 570, 244 A.2d 42, 44 (1968); *Condemnation of 110 Washington Street, Borough of Conshohocken,* 767 A.2d 1154, 1158-59 (Pa. Commw. 2001); *Appeal of Swidzinski,* 134 Pa. Commw. 330, 333-34, 579 A.2d 1352, 1353 (1990); *Speicher Condemnation Appeal,* 58 Pa. Commw. 321, 326, 428 A.2d 282, 285 (1981); *Golding Condemnation Case,* 33 Pa. Commw. 635, 638, 382 A.2d 509, 511 (1978); *Avery v. Commonwealth,* 2 Pa. Commw. 105, 109, 276 A.2d 843, 845 (1971).

These presumptions and limitations on our role are firmly grounded in considerations of constitutional dimension having to do with the need to separate and hold in strict equipoise the powers of the branches of our tripartite government. *Weber v. Philadelphia,* 437 Pa. 179, 183, 262 A.2d 297, 299 (1970); *Hatfield Township Appeal,* 28 Pa. Commw. 109, 115 n.3, 367 A.2d 747, 750 n.3 (1977); *Stubbs v. Snyder Township,* 25 Pa. Commw. 613, 361 A.2d 464 (1976). As Mr. Chief Justice Gibson wrote early in the history of this Commonwealth in the case reported as *Borough of West Philadelphia,* 5 Watts & S. 281, 283 [(1843)]: "It is on the preservation of the lines which separate the cardinal branches of the government, that the liberties of the citizen depend."

Pursuant to section 406(a) of the Eminent Domain Code, 26 P.S. §1-406(a): "[p]reliminary objections shall be limited to . . . challenging (1) the power or right of the condemnor to appropriate the condemned property . . . ; (2) the sufficiency of the security; (3) any other procedure followed by the condemnor; or (4) the declaration of taking." Section 406(b), 26 P.S. §1-406(b) requires preliminary objections to "state specifically the grounds relied upon."

The challenges here raised by the Sahas with respect to the city's exercise of its power of eminent domain are the subject of some 28 sub-paragraphs of paragraph three of their preliminary objections. Two of these[134] concern the ability or willingness of the city to offer just compensation; a subject inappropriate for consideration in

---

134. Paragraphs 3(d) and (e).

this context. As the court wrote in *Roudebush v. Meadville,* 241 Pa. 261, 265, 88 A. 446, 447 (1913):

"It has been long held that it is not essential that the damages shall be actually determined or paid before the appropriation of the land; no more is it necessary that the money shall be set apart. The legislation upon the subject gives a complete system for ascertaining and securing payment of the damages; this affords ample protection to all concerned . . . ."

The leading case of *Township of Chester v. PennDOT,* 20 Pa. Commw. 60, 63, 339 A.2d 892, 894 (1975) (emphasis in original), in which the township as condemnee "objected to the *power and authority* of the Commonwealth to condemn because it had not provided [in its legislative authority] for just compensation," stands for the proposition that "it is clear that [Eminent Domain Code] section 406, . . . preliminary objections are not the proper procedural device to mount such a challenge." *Id.* at 65, 339 A.2d at 895. See also, *Nordhoy, Ramsey Appeal,* 119 Pa. Commw. 620, 625, 547 A.2d 867, 869 (1988). In *In re Condemnation by Penn Township, York County,* 702 A.2d 614 (Pa. Commw. 1997), the condemnee challenged the sufficiency of the $2.5 million bond posted by the condemnor as predicated on an improper and inadequate appraisal. Relying on *Matter of Land in Borough of Centralia,* 658 A.2d 481 (Pa. Commw. 1995), *petition for allowance of appeal denied,* 542 Pa. 651, 666 A.2d 1059 (1995), as well as the express terms of Eminent Domain Code §403,[135] the court held that the

---

135. 26 P.S. §1-403 provides in pertinent part that "[W]here a condemnor has the power of taxation, it shall not be required to file a bond with the declaration of taking."

amount of security is irrelevant where the condemnor is a taxing body. The condemnor is deemed to have pledged its tax revenues and this adequately secures the condemnee's ultimate award of just compensation for the taking. Accord *Nordhoy, Ramsey Appeal,* 119 Pa. Commw. 620, 547 A.2d 867 (1988); *In re City of Scranton,* 132 Pa. Commw. 175, 184-85, 572 A.2d 250, 255 (1990). The city possesses the power to tax. The preliminary objections made the subject of paragraphs 3(d) and (e) are, on these bases, overruled.

Sub-paragraphs 3(i), (j), and (k) of the preliminary objections assert that the uses of land proposed to be conducted by the city on the Sahas' lands taken in Valley Township will violate the zoning regulations of that municipality. This challenge is also improperly raised at this juncture. The issue of whether the regional family recreational complex will be, in whole or in part, violative of the regulations of the municipality in which it is located, may not be raised by the condemnees by preliminary objection. As the court wrote in *Thompson Appeal,* 427 Pa. 1, 4, 233 A.2d 237, 239 (1967):

"In other words the condemnees lack standing in this eminent domain proceeding to object to the taking on the ground that there may be a future legal or factual objection to the proposed use. See *Upper Dublin Twp. Auth. v. Piszek,* 420 Pa. 536, 218 A.2d 328 (1966)."

To the same effect, in *Simco Stores v. Redevelopment Authority,* 455 Pa. 438, 443-44, 317 A.2d 610, 613 (1974), the court reasoned:

"We have previously held that the scope of preliminary objections under [Eminent Domain Code] section 406(a) is to be limited. *Commonwealth Appeal,* 429 Pa.

254, 239 A.2d 343 (1968). It is the clear intent of section 406 to dispose of challenges to the validity of a condemnation as soon as possible after the taking as evidenced by the fact that preliminary objections must be filed within 30 days after service of notice of condemnation. When the authority filed the declaration of taking, it was in full compliance with the terms of its authority and the condemnation was effective and valid as of that date. The authority may take the land for an authorized purpose and subsequent legal or factual objections will not render that taking invalid."

In the case cited by the *Thompson Appeal* court, *Upper Dublin Township Authority v. Piszek,* 420 Pa. 536, 218 A.2d 328 (1966), the condemnation was for the purpose of constructing a sewage treatment facility and the condemnee raised by preliminary objection an asserted prohibition contained in the zoning regulations of the municipality in which the facility was to be located.

"Appellants finally assert that the taking is improper because the proposed use conflicts with the Springfield Township zoning ordinance, which zones this area for municipal uses. Although decided by the court below, this question is not to be decided here, for the authority must initially go before the zoning board of the municipality of location of the land, as was required of the school district in *School District of Philadelphia v. Zoning Board of Adjustment,* 417 Pa. 277, 207 A.2d 864 (1965). The zoning determination, however, is not a requisite of an effective taking by the authority. The authority under section 11 of the Act of 1945,[136] as amended, may take

---

136. The Municipal Authorities Act of May 4, 1945.

land for an authorized purpose, and it may do this whether or not the use may in fact be made in the future because there is a legal or factual objection. Such an interpretation is required in order to best utilize the two forums involved, avoid undue delay before compensation, and protect the authority in its long range plans which may envisage future uses and changing zoning laws." *Upper Dublin Township* at 540-41, 218 A.2d at 331.

On these bases, we overrule those preliminary objections challenging the proposed recreational use as in violation of the "host" municipality's regulations.

Sub-paragraphs 3(q) and (s) of the preliminary objections challenge the city's actions as an unlawful delegation of governmental discretion to "administrative employees and outside consultants." No argument or citation to authority is provided in support of this objection in the Sahas' written presentation or was included in the extensive oral argument and, therefore, we must consider this challenge to have been, for these purposes,[137] withdrawn.[138]

---

137. We do not comment on the issue of whether the objection is thereby waived for all purposes or is, nevertheless, preserved.

138. The evidence of record lends no support to such an objection, in any event. Cf. *Condemnation of 110 Washington Street, Borough of Conshohocken,* 767 A.2d 1154, 1159 (Pa. Commw. 2001), in which a contract between the condemnor and a private developer granting to the latter the power to require condemnation, was declared to be an unlawful delegation of legislative discretion. There is neither allegation nor evidence in this case that anyone other than the members of city council acting in their official capacity made the final decision to take the official formal action to condemn the lands here at issue. We must also deem to have been withdrawn, for lack of argument or citation to authority, the objection made the subject of paragraph 3(bb) to the effect that the condemnation is violative of the governor's execu-

We must also reject the condemnees' challenge based on the asserted violation by the city of its charter's procedural requirements in the enactment of ordinance no. 1132-2000.[139] The condemnees first contend that the special meeting of city council conducted on June 13, 2000, was not called by the presiding officer as required by charter §11.2-211. The record evidence, including, particularly, the affidavit taken by City Council President Stephon Hines on June 14, 2001, and admitted into the record of these proceedings as exhibit "C-36," establishes the contrary.[140] The condemnees also assert that notice

tive order no. 1997-6. No evidence of record was adduced in support of this objection and the executive order, by its terms, governs only the conduct of executive agencies of this Commonwealth, a category that does not include the city. In addition, this challenge, to the extent that any meaning can be derived from it, appears to be directed at the use proposed to be made of the lands condemned and to center on the contention that such use will be inconsistent with the farming activities sought to be protected by the executive order. As in *Upper Dublin Township Authority v. Piszek,* cited and described in the text, such challenges, amounting to the invocation of potential legal and factual obstacles to the realization of the developmental purposes for which the land was taken, are not properly raised as Eminent Domain Code §406 preliminary objections.

139. There can be no doubt that procedural formalities must be met in the enactment of municipal ordinances, as the leading decision of our Supreme Court, involving Mr. Janssen's former employer and the court's censure of the failure to meet such requirements, apparently during his tenure, makes clear. *Lower Gwynedd Township v. Gwynedd Properties Inc.,* 527 Pa. 324, 591 A.2d 285 (1991) (concerning an ordinance adopted on December 22, 1987). However, as we discuss in the text, the record here fails to indicate any violation.

140. See also, exhibit "C-37"; the affidavit of City Manager Janssen to the same effect as his testimony at pp. 71-73, 386-88, 397-99 and that contained in exhibit "C-36." In addition we note that the charter language is permissive, not mandatory: "[s]pecial meetings may be held on the call of the presiding officer . . . ." Finally, and in the alter-

of the meeting was not "prominently posted at city hall" as required by the cited charter provision but, again, the overwhelming weight of the record evidence is otherwise as our factual findings make clear.[141]

The remaining objections present in various forms and particulars, challenges to the power or right of the city to condemn the Sahas' lands and the reasonableness of the city's decision to do so. As such, these objections fall within the limited purview of Eminent Domain Code §406[142] as further explicated by such authorities as *Winger v. Aires,* 371 Pa. 242, 247, 89 A.2d 521, 523 (1952). These objections raise issues of great complexity and significance, the resolution of which will require an extended analysis.

The particular issues raised within this general category include: (i) a broad challenge to the power of the city to take land for the purposes here involved;[143] (ii) a challenge to the power of the city to condemn for the purposes here involved lands like that of condemnees located outside of the city's geographic boundary;[144] (iii) a challenge to the instant purpose for the condemnation

---

native, we hold that this issue was not raised in the condemnees' preliminary objections. Eminent Domain Code §406(b), 26 P.S. §1-406(b), requires all preliminary objections to "state specifically the grounds relied upon." The condemnees refer to preliminary objections paragraphs 3(t) and (x) neither of which refer to the procedural requirements contained in the city charter or to any challenge predicated thereon. These issues are, therefore, waived.

141. See factual findings nos. (40)-(42). See also, Pilotti pp. 7-8; Green p. 216.

142. 26 P.S. §1-406.

143. See for example, preliminary objections at ¶3(z).

144. *Id.*

as unlawfully "private"; [145] (iv) and in competition with other private enterprises;[146] and (v) a challenge to the necessity of the condemnation to serve the city's lawful purposes.[147] We will discuss these challenges in turn.

The analysis must begin, of course, with an identification of the purposes for which the condemnees' lands were here taken. In the initial declaration of taking filed by the city on August 2, 2000, the purpose of the condemnation is described in paragraph six in the following terms:

"(6) The property has been condemned by the City of Coatesville for the purposes of creating and establishing a public golf course and related facilities and other recreational uses comprising a regional, family, recreational complex as provided for by the ordinance." [148]

The ordinance referred to, being the city's ordinance no. 1132-2000 enacted June 26, 2000, provides no additional description of the purpose to be served by the condemnation. The fifth introductory paragraph of the ordinance contains the only pertinent language in providing:

"Whereas, The [sic[149]] City of Coatesville desires to create a public golf course and related facilities and to establish other recreational uses . . . ." [150]

The city's regional, family, recreational complex itself, including the "other recreational uses" to be there

145. *Id.* at ¶3(c), (u), and (v).

146. *Id.* at ¶3(aa).

147. *Id.* at ¶3(m).

148. See exhibit "C-33" at ¶6, p. 2 (not Bates-numbered).

149. See exhibit "C-23," the agenda for the city council's June 26, 2000 public meeting at p. C001842.

150. The ordinance was admitted into the record of these proceedings as exhibit "Saha-18."

established, as is indicated above, has been authoritatively described in the following terms found in the statement of purpose for the city's year 2000 issue of general obligation bonds which were intended to fund the initial planning, engineering, and legal costs related to the facility as well as land acquisition therefor:

"Indoor recreational facilities will include batting cages, a two-rink ice-skating facility, bowling center and multiplex theater. Outdoor recreational activities include an 18-hole golf course, pro golf shop, driving range, miniature golf, boating and canoeing, pitch and putt course and go-carts. Indoor and outdoor rock climbing will also be offered."

The city attempted to address in this litigation the ambiguities inherent in these provisions by filing, on February 13, 2001, an amended declaration of taking. No leave of court was sought or obtained prior to this filing and condemnees have strongly objected to this procedure. The amended declaration of taking is limited paragraph six of the declaration set forth above, so as to read with respect to the condemnees, as follows:

"(6) The property has been condemned by the City of Coatesville for the purposes of creating and establishing a public golf course and golf-related facilities, as provided for by the ordinance." [151]

Condemnees have moved to strike the amended declaration of taking on the grounds that: (1) the Eminent Domain Code contains no authority for such a filing under these circumstances; (2) no leave of court was sought or obtained; and (3) no formal action of city coun-

---

151. See exhibit "C-34" at unnumbered p. 2 (not Bates-numbered).

cil authorized the filing. The city responds that statutory authority can be found in Eminent Domain Code §1-406(e), that leave of court was not required, and that the initial declaration, by its express terms, authorized the amended filing. We will consider each of these responsive contentions in turn.

At the outset, we do not agree with the city that Eminent Domain Code §406(e)[152] authorizes the amended filing here at issue. The statutory provision, within the context of the procedures applicable to preliminary objections, provides that "[t]he court may allow amendment or direct the filing of a more specific declaration of taking."

We read this provision as a description of the power of the court,[153] specifying two alternative judicial responses to the filing of preliminary objections. We do not find within this provision, authority of the condemnor, without judicial leave or direction, to file an amended declaration some five months after the interposition of preliminary objections to the initial declaration and during the period when the court has directed the parties to conduct evidentiary proceedings necessary to the resolution of issues raised by the initial responsive filing.

The legislature, in enacting Eminent Domain Code §406,[154] was certainly aware of the procedure, applicable

152. 26 P.S. §1-406(e).

153. Indeed, as we will discuss shortly, we will avail ourselves of this statutory grant of authority in the order entered herewith.

154. Eminent Domain Code §406, 26 P.S. §1-406, was enacted on June 22, 1964 and has been amended once since that date, by the Act of December 5, 1969, P.L. 316, to entitle the condemnee in sub-section (e) to damages in the event that preliminary objections "are finally sustained, which have the effect of finally terminating the condemna-

to preliminary objections in civil actions generally, under Pa.R.C.P. 1028.[155] Indeed, the comments contained in the 1964 report of the Joint State Government Commission responsible for the draft Eminent Domain Code, indicate that "[s]ub-sections (b), (c), and (e) were derived from the Pennsylvania Rules of Civil Procedure, Rule 1028, relating to preliminary objections in an action in assumpsit." Pa.R.C.P. 1028(c)(1) provides, in pertinent part, that "[a] party may file an amended pleading as of course within 20 days after service of a copy of the preliminary objections." Pa.R.C.P. 1028(e) has required since the amendments of March 28, 1973, that amended pleadings otherwise must be filed within 20 days of notice of the order permitting the amendment. Prior to these amendments and from the original adoption of the rule on June 25, 1946, the court was required to specify in the order permitting or requiring the amended pleading to "fix the time within which it must be filed."

It is clear to us that if the legislature had intended to permit the filing of amended declarations of taking without leave of court, it would have provided for the same by express language similar to that found in Rule 1028 and would have strictly limited the period during which such amendment could be accomplished. It seems equally obvious that the absence of such a procedure in Eminent Domain Code §406 is the reasonable product of the es-

tion . . . ." While we here sustain a number of the condemnees' preliminary objections, the effect thereof is to require the filing of a further amended declaration of taking and not to finally terminate the condemnation.

155. Rule 1028 was first adopted on June 25, 1946. We discuss the legislative history of the rule in the text.

sential difference between the functions served by the initial pleadings in civil actions generally and in eminent domain matters in particular. The declaration of taking, unlike the writ of summons or complaint in civil actions generally, effects immediately on its filing the rights and interests of the parties, there and then transferring title to the condemned land from the condemnee to the condemnor.[156] It is to us entirely reasonable that the legislature would not include in the context of Eminent Domain Code §406 a procedure for unsupervised amendment of the declaration of taking.

We also note that an unrestricted right of unsupervised amendment as is here claimed by the city would render uncertain in effect other provisions of the Eminent Domain Code. As one significant example, Eminent Domain Code §408[157] permits the revocation of condemnation proceedings by the filing of a declaration of relinquishment but strictly limits the period of time in which the proceedings can be ended by this means to "one year from the filing of the declaration of taking . . . ." If the condemnor possesses the power to file, without judicial supervision, amended declarations many months after

---

156. Section 402 of the Eminent Domain Code, 26 P.S. §1-402 provides:

"*Section 1-402. Condemnation; passage of title; declaration of taking*

"(a) Condemnation, under the power of condemnation given by law to a condemnor, which shall not be enlarged or diminished hereby, shall be effected only by the filing in court of a declaration of taking, with such security as may be required under section 403(a), and thereupon the title which the condemnor acquires in the property condemned shall pass to the condemnor on the date of such filing, and the condemnor shall be entitled to possession as provided in section 407."

157. 26 P.S. §1-408.

the filing of the declaration thereby amended, the one-year limit on relinquishment ceases to be meaningful.

The city has brought to our attention the opinions of other trial courts of this Commonwealth in which, under circumstances very different from those here presented, amendment of the declaration of taking has been permitted without prior judicial leave.[158] The decisions cited do not address the arguments we have found controlling and, therefore, are not persuasive.[159] Finally, we are aware

158. *In re Powell,* 14 D.&C.3d 38 (Bucks Cty. 1980) and *In re Condemnation of Lands of Meyer,* no. 1-Edd-1989, Wayne County, filed June 22, 1990, *aff'd without opinion,* 141 Pa. Commw. 717, 595 A.2d 1330 (1991), *appeal denied,* 529 Pa. 660, 604 A.2d 251 (1992). With respect to the affirmance of the order of the Court of Common Pleas of Wayne County we note that section 414 of chapter 4 of the internal operating procedures of the Pennsylvania Commonwealth Court codified at 210 Pa. Code §67.55 provides that "[t]hese unreported opinions of the court shall not be cited in any brief, argument or opinion, except that any opinion filed in the same case may be cited as representing the law of that case." It would appear that, by citing to (and expressly relying on: "the Commonwealth Court affirmances . . . support the city's position . . . ." Condemnor's memorandum in support of its response to condemnees' motion to strike at p. 4) the unreported opinion of the Commonwealth Court, the condemnor has violated this ban and we note that the prohibition, by its terms, applies to briefs and arguments generally and is not limited to briefs and arguments filed in the Commonwealth Court.

159. For example, in *In re Powell,* the court appears to have been faced with the condemnees' contention that amendment of the declaration of taking was not permitted even with judicial leave and that the only course open to the condemnor was the initiation of a second condemnation proceeding. We here decide only that a substantive amendment made more than five months after the initial filing, following the interposition of preliminary objections, and during the conduct of evidentiary proceedings required by court order and addressed to the issues raised by the initial filings, requires judicial approval. The opin-

that a number of courts,[160] have permitted purely technical, nonsubstantive amendment of a declaration of taking to be made without formality and we have no quarrel with these authorities. The amendment here at issue was designed to alter the court's determination of the then pending preliminary objections. It had the intended effect of eliminating from the uses to which the condemned land could be devoted:

"Indoor recreational facilities . . . includ[ing] batting cages, a two-rink ice-skating facility, bowling center and multiplex theater [and] [o]utdoor recreational activities includ[ing] . . . miniature golf, boating and canoeing, . . . and go-carts [and] [i]ndoor and outdoor rock climbing . . . ."

We do not consider this amendment, in the circumstances, to be properly categorizable as "purely technical and nonsubstantive." Without leave of court, the amended declaration of taking, filed on or about February 13, 2001, was of no effect and we here grant with respect to it the condemnees' motion to strike.

We are also in agreement with the condemnee that the filing of an amended declaration, just like the initial filing, required the affirmative, formal assent of the condemnor's governing body, city council. The condemnor contends that authority for the presentation to the court of an amended declaration of taking is found in the

---

ion of the Pennsylvania Commonwealth Court on appeal in *Powell* (reported as *Mershon Appeal,* 76 Pa. Commw. 424, 463 A.2d 1287 (1983)) does not refer to the amendment of the declaration of taking or to any issue raised in connection therewith.

160. See for example, *Upper Dublin Township Authority v. Piszek,* 85 Montg. 197 (1965), *aff'd,* 420 Pa. 536, 218 A.2d 328 (1966).

following language contained in ordinance no. 1132-2000 enacted following second reading on June 26, 2001, and appended as exhibit "A" to the initial declaration:[161]

"Now, therefore, in accordance with the foregoing authority, the council of the City of Coatesville authorizes the city manager or other authorized party and the city solicitor to proceed with the amicable acquisition of such property and property interests identified in this ordinance and further authorizes the city manager or other authorized parties and the city solicitor to prepare and file with the appropriate court *one or more* declarations of taking to effect the condemnation of any or all of the properties and property interests identified in this ordinance and to take any other legal action necessary or desirable to acquire said properties and property interests for the purposes as set forth in this ordinance." (emphasis added)

We have no doubt that the language referred to is unrelated to the procedure here followed and, instead, was intended to authorize the city manager and solicitor to proceed as is described in section 402(c) of the Eminent Domain Code, 26 P.S. §1-402(c) which is as follows:

"Section 1-402. Condemnation; passage of title; declaration of taking . . .

"(c) The condemnor may include in one declaration of taking any or all of the properties specified in the action by which the declaration of taking was authorized. The prothonotary shall charge one fee for filing each

---

161. See condemnor's memorandum of law in support of its response to condemnees' motion to strike the amended declaration of taking at p. 11; Janssen pp. 263-69. The said language is found, inter alia, in exhibit "C-23" at p. C001843.

declaration of taking, which shall be the same regardless of the number of properties or condemnees included therein."

This provision permits a condemnor to proceed by means of a single declaration of taking (and payment of a single fee therefor) describing therein all of the properties the acquisition of which is necessary for the project. This is the form of the city's ordinance no. 1132-2000, which authorized the acquisition of the condemnees' property along with the properties of A. Duie Pyle Inc.; Ezril and Gertrude Horwitz; Everett and Mary Sheeder; Christopher and Kathryn Snyder; Dimitrius Zaferes; Joseph Ursini, and Paul Phillips; Gary and Marie Hanna; David and Linda Denbraven; and the Brandywine Railroad Company Inc.; the Consolidated Rail Corporation; and the Norfolk Southern Railroad.[162]

The language here relied upon, referring to "one or more" declarations of taking, empowered the city manager and solicitor to file a single declaration thereby condemning all of the properties described in the ordinance, or nine declarations—one for each of the properties condemned, or any permutation between these extremes. In fact, the city filed the instant declaration describing only the property of the condemnees and has, by its manager and solicitor, expressed an intent to proceed against other properties which it has been unable to amicably acquire

---

162. Indeed, in an unsolicited letter argument submitted by the city and dated February 8, 2001, ordinance no. 1132-2000 is described as "a 'blanket' ordinance, identifying in one piece of legislation all of the properties and property interests which the city . . . desires to acquire or condemn. . . ." Such "blanket" ordinances are the subject of and are expressly authorized by Eminent Domain Code §402(c) and by the ordinance language here relied upon by the city.

by separate filing(s),[163] all as is expressly authorized by the "one or more" language of the ordinance and by Eminent Domain Code §402.

As we have indicated, however, the city here argues that the phrase "one or more" was intended not only to authorize the procedure we have described but additionally to empower the manager and solicitor to revise without limitation the substantive language contained in the declaration filed with respect to any particular property or properties. Thus, as in this case, if city council, by ordinance duly enacted, condemns land for purposes that include a hotel and conference center, an ice-skating rink, and indoor and outdoor rock climbing, the manager or solicitor, acting on the strength of the "one or more" language without the involvement or assent of council and many months after the initial filing, may, it is here asserted, restrict by the filing of an amended declaration the purposes to which the condemned land may lawfully be devoted to those related to a golf course. We do not believe that such a far reaching and unconstrained discretion on the part of appointed officials is the fair import of the legislative language to which our attention has been directed.

The city's charter vests the legislative power exclusively in city council.[164] While city council is empow-

---

163. In fact, the city proceeded by separate declaration of taking filed on September 14, 2001, against the property of David and Linda Denbraven (docketed to no. 01-07598) and by separate declaration of taking filed on November 16, 2001, against the property of Gary and Marie Hanna (docketed to no. 01-09490). See our opinion filed simultaneously herewith in the matter of *Valley Township v. City of Coatesville,* no. 01-09098, slip op. at pp. 2 n.4, 3.

164. City Code §11.1-104.

ered to act by other means in other contexts,[165] the power of eminent domain may only be exercised by ordinance,[166] that is, by the formal legislative will of a majority of a quorum of council duly convened and casting a recorded vote following public notice, advertisement, and an opportunity for the citizenry to be heard.[167] A significant substantive alteration to legislative language previously considered can only be effected by re-advertisement and formal reconsideration by council.[168] Even if the language of ordinance no. 1132-2000 could fairly be construed to contain a delegation to the city manager and solicitor of the power to change the purpose for which land has been condemned, such delegation would violate the city's charter. This consideration militates strongly against the interpretation here proffered, an interpretation which fails to obtain support from the express language of the legislation in any event. For all of these reasons, we reject the city's position that formal action of city council was not required to effect the amendment here made the subject of the amended declaration of taking filed on February 13, 2001.

We recognize that this court, in the case reported as *Chester County Water Resources Authority v. O'Brien,* 17 Ches. Co. Rep. 193 (1969), directed the amendment of the statement of purpose contained in a declaration of

---

165. *Id.* at section 11.2-214.

166. *Id.* at section 11.3-301(F). We note that section 2801 of the Act of June 23, 1931, P.L. 932, *as amended,* 53 P.S. §37801, discussed in the text below, also requires cities of the third class to proceed by ordinance in the taking of land for the establishment of recreation places.

167. *Id.* at sections 11.2-213, 214.

168. *Id.* at section 11.3-304(C).

taking challenged by preliminary objection. No reason appears why we should not follow this precedent.[169] The absence of authority of the condemnor in this case to file its amendment without judicial leave in no way diminishes the power and authority of the court to require an amendment, a power, as we have noted, found in the express language of Eminent Domain Code §406(e).[170] We will, therefore, grant the Sahas' motion to strike the amended declaration of taking filed on February 13, 2001. At the same time, however, in the order that follows, we will permit and require the amendment of the instant declaration so as to specify that the purpose for which the Sahas' lands have been taken is limited to, and those lands shall be used for nothing other than as and for, a municipal golf course, a component thereof, or a facility directly ancillary thereto, such as a golf training facility under the auspices of and as a member of The First Tee National Association, which is, as we have indicated in the margin, an initiative of the World Golf Foundation dedicated to providing affordable access to golf, especially to youth of limited financial means.[171]

---

169. This was also the procedure adopted by the trial court and ultimately affirmed in *Pidstawski v. South Whitehall Township,* 33 Pa. Commw. 162, 380 A.2d 1322 (1977), where the trial court sustained the preliminary objection challenging the adequacy of the statement of purpose contained in a declaration of taking by which about 80 acres were condemned for park and recreation purposes.

170. 26 P.S. §1-406(e).

171. These are the precise uses which the city here asserts it has at all times contemplated for the Saha property. See for example, Janssen pp. 12, 272, 550-52. We will have no occasion, therefore, to address either the city's contention that ordinance no. 1132-2000 did not authorize, and the declaration of taking did not include among its purposes as written and initially filed, a hotel and conference center; or

Notwithstanding our resolution of this issue, we remain deeply troubled by the procedure here adopted by the city of enacting an ordinance which authorizes at one stroke and with one statement of general purpose, the condemnation of a number of properties to be devoted, along with other contiguous lands previously acquired by the city, to an overall project which includes uses of land for which the city has been granted the power of eminent domain and other uses for which the city, concededly, has no such power.

The inherent ambiguities created by this procedure are only compounded by the state of the record as it relates to the location of particular land uses in the overall proposal. Each of the witnesses who testified on behalf of the city made clear, and the city continues to assert, that none of the plans produced thus far with respect to the location of components of the regional family recreational complex can be considered "final" in any respect,[172] and that no part of the layout or arrangement of uses is "cast in stone." [173]

the contention that all of the uses described in the year 2000 bond issue prospectus, quoted in the text above, excepting only the hotel and conference center, are among those for which the city may properly exercise its power of eminent domain. Had it been necessary to do so, we would have rejected both of these contentions out of hand.

172. See for example, Janssen pp. 187 ("Saha-22"); 200 ("C-4"); 204-205 ("C-5," "C-7"); 206 ("Saha-40"); 210 ("Saha-41"); 454 (location of movie theater is "fluid at this point"); Chertok pp. 131-33 (golf course design).

173. Or "etched in stone." See for example, Janssen pp. 11-12 (whether to construct a movie theater as a component of the regional facility); 319-20 (location of movie theater); Hines pp. 47-48 (layout of chip and putt course on exhibit "Saha-22A"); 79 (golf course plan); 102 ("I can say that there was, again, nothing etched in stone about the whole project"); 166 ("The revitalization plan [exhibit "Saha-41"] . . . wasn't something that was concrete, that was etched in stone").

This state of the record permits the city to defend against the preliminary objections filed by any particular condemnee by asserting that the lands of that condemnee will be devoted to uses at the center of the city's condemnation power while the uses for which the city has no power or only a debatable power to take land will be located elsewhere, for example, on the lands previously acquired or on the lands of those condemnees with whom an amicable arrangement has been reached or for whom the period for the timely interposition of preliminary objections has expired. It is even possible, if at some later juncture, when the plans have become "final" and the location of particular uses is "cast in stone," it should turn out that condemned lands are devoted to uses outside of the city's eminent domain power, that the city would then argue that no potential protestant remains possessed of standing.[174]

174. We resist the conclusion that this procedure has been adopted by the city in an attempt to avoid, or circumvent, the protections afforded to affected citizens and landowners by judicial review. Acceptance of this conclusion would, either alone or, even more distressingly, in combination with the view of council made evident by the following statement of its president, strike at the very heart of our democratic institutions. Council President Hines was asked during his deposition whether the appearance of up to two hundred protestors at the public meeting on April 12, 1999 (when the initial condemnation ordinance was first read) motivated the governing body to suspend consideration of the condemnation ordinance then passed on first reading, and he responded as follows: "I disagree, because *this council recognized that those 200 people weren't from Coatesville, so it didn't even matter. . . . The majority of those people were not Coatesville residents, couldn't vote or not vote against anyone on the council.*" Hines p. 328. (emphasis added) The parties apparently attach little significance to this statement. In our view, however, it underscores the potential for injury to our democratic institutions inherent in the legislature's grant to cities of extraterritorial condemnation power es-

If the evidence here adduced by the condemnees had provided any support for a conclusion that the scenario just described was more than entirely hypothetical, we would not hesitate to condemn the practice by sustaining the objection and setting aside the condemnation. Instead, the evidence appears to confirm that the condemnees' lands have been from the outset and continue to be contemplated exclusively for uses related to golf, including a First Tee training center, a driving range, and an executive, par three, nine-hole golf course.[175] We will address the legitimate concern here raised by the condemnees by requiring that the city act in conformance with its representations of intent to this court and

---

pecially when that grant is combined with the nearly limitless conception of "public purpose" expressed by the judiciary in such decisions as *Dornan* and *Berman v. Parker.* The city here contends that it is, in the decision here challenged, beyond the reach of effective review by the affected electorate, the judiciary, and the duly promulgated subdivision regulations of the municipality in which the project will be located. The city does not suggest, and we have been unable to imagine, to what supervisory institution it is willing to answer. We could not more fundamentally disagree with this aspect of the city's position. In any event, these issues, by necessity, are appropriately addressed to the legislature.

175. Janssen pp. 205, 272 ("at the time that the original declaration of taking was filed . . . the use of the property owned by the Sahas for golf and golf-related purposes was etched in stone"); 550-52. Green pp. 173-74. To be sure, one concept plan depicted batting cages on a remote portion of condemnees' lands (see exhibit "Saha-22"; Janssen p. 317) and Council President Hines stated in his deposition that it remained conceivable that condemnees' lands would be improved by the ice-skating rink component of the regional recreation center. Hines pp. 64-65. As we indicated in the text, we will require that condemnees' lands be used, if at all, only for a purpose within the city's statutory grant of the power of eminent domain; *i.e.,* as a golf course component or related facility.

within its legitimate authority.[176] This determination also permits us to reject the condemnees' challenge to the adequacy of the statement of purpose contained in the declaration of taking when measured against the mandate of Eminent Domain Code §405(c)(7).[177] The statement of purpose as we will here require its amendment satisfies the statute.

With this necessary analytic diversion, we return to our discussion of the condemnees' challenges to the power or right of the city to condemn their lands for golf and golf-related uses as we will require the declaration to be amended.

As we have indicated, the city's powers are derived from the Third Class City Code.[178] Many of the provisions of the Third Class City Code concerning eminent

176. By requiring the city to use the property taken only in conformance with the representations offered in justification of the condemnation, we do no more than apply the rule of such cases as *Lance's Appeal,* 55 Pa. 16 (1867), in which the court wrote:

"The right of the Commonwealth to take private property without the owner's assent on compensation made, or authorize it to be taken, exists in her sovereign right of eminent domain, and can never be lawfully exercised but for a public purpose—supposed and intended to benefit the public, either mediately or immediately. The power arises out of that natural principle which teaches that private convenience must yield to the public wants. *This public interest must lie at the basis of the exercise, or it would be confiscation and usurpation to exercise it. This being the reason for the exercise of such a power, it requires no argument to prove that after the right has been exercised the use of the property must be held in accordance with and for the purposes which justified its taking. Otherwise it would be a fraud on the owner, and an abuse of power."* (emphasis added)

177. 26 P.S. §1-405(c)(7). See preliminary objections at ¶3(o).

178. The Act of June 23, 1931, P.L. 932, *as amended,* (referred to hereinbelow occasionally where the context admits of no ambiguity as the "Code" and, otherwise as the "Third Class City Code"). The

domain have been repealed by the Eminent Domain Code, the Municipalities Planning Code, and the Judicial Act Repealer Act.[179] The only provision of the Third Class City Code cited by the city or discovered by research which remains in effect and authorizes the city to condemn land for park purposes outside its geographic boundary is section 3703 of the Code, 53 P.S. §38703, the full text of which is as follows (with emphasis added):

"Section 38703. Acquisition of lands and buildings

"*Cities may* enter upon, *take,* use, purchase and acquire, by gift or by the right of eminent domain, *lands, property and buildings, for* the purpose of making, extending, enlarging, and maintaining[1] *recreation places which shall consist of public parks, parkways, playgrounds, playfields, gymnasiums, public baths, swimming pools, or indoor recreation centers,* may levy and collect such special taxes as may be necessary to pay for the same, and make appropriations for the improvement, maintenance, care, regulation,[2] and government of the same. Cities may designate and set apart for use for any of the purposes specified in this section lands and buildings owned by such cities and not dedicated or devoted to other public use. Cities may also lease lands and buildings in such cities for temporary use for such purposes. *Lands, property and buildings outside the limits of the city may be acquired in like manner for recreation places,* and such lands may be annexed to the city, in the manner

city's home rule status does not expand this power. 53 Pa.C.S. §2962(a)(2).

179. Act of April 28, 1978, P.L. 202, no. 53.

provided by this act for the annexation of territory to a city.

"1. Enrolled bill reads 'maintaining.'

"2. Enrolled bill reads 'regulations.' "[180]

In contrast, "recreation places" generally and without qualification are the subject of section 2801 of the Code, 53 P.S. §37801[181] by which the city is empowered to condemn land within its boundary for this unqualified purpose.[182] As it pertains to the condemnation of lands, without the city, however, the legislature defined the city's power with greater care. The "recreation places" for which the city may condemn lands outside its boundary are expressly limited to "public parks, parkways, playgrounds, playfields, gymnasiums, public baths, swimming pools, or indoor recreation centers." An interpretation of 53 P.S. §38703, so as to permit the condemnation of lands outside the city as and for recreation places generally and without qualification, would render the language just quoted mere surplusage and of no

180. The constitutionality of sections 3701 and 3702 of the Third Class City Code which, by its terms, permitted cities to appropriate lands for park purposes without payment of just compensation, was successfully challenged in the litigation reported as *Miller v. Beaver Falls,* 368 Pa. 189, 82 A.2d 34 (1951). In *In re Annexation to the City of Easton,* 139 Pa. Super. 146, 11 A.2d 662 (1940), the court held that section 3703 of the Third Class City Code authorizes the condemnation for park purposes of lands outside the city's geographic boundary and further authorizes the annexation of such lands but only if they are contiguous to, *i.e.,* directly adjoin, the city.

181. 53 P.S. §37801 provides, in pertinent part: "In the . . . establishing of recreation places, . . . a city may . . . take . . . private lands . . . ."

182. Statutory provisions limiting or precluding extraterritorial condemnation for park purposes are common. See the authorities collected

effect. We are forbidden from adopting such an interpretation.[183] If, as the city here expressly contends, ice-skating rinks, batting cages, go-cart tracks, rock climbing facilities both indoor and outdoor, and multiplex movie theaters are all properly categorized as "recreation places" then the remainder of the statutory language may be ignored and section 3703 of the Code creates with respect to extraterritorial condemnations, no greater or lesser power than was codified in section 2801 of the Code with respect to the condemnation of lands within the city.

In an attempt to give separate effect to each of these provisions, as we are required to do[184] we are impelled to grant a narrower, more restricted and qualified scope to the power made the subject of Code §3703 than is found in section 2801. The city's position equates "recreation" with "entertainment," as only this equivalence would permit the categorization of a movie theater as a place of recreation. This may be appropriate in the unqualified context of Code §2801 inasmuch as the noun "recreation" may properly refer to any diversion or amusement which "recreates" the mind, body, or spirit after toil.[185] How-

in 26 Am.Jur.2d Eminent Domain §85 n.5 (Lawyer's Coop. 1996). It has been held that townships of the second class in this Commonwealth have no power of condemnation for recreational purposes. *Olson v. Whitpain Township,* 141 Pa. Commw. 270, 595 A.2d 706 (1991).

183. The Statutory Construction Act contains the mandate "if possible, to give effect to all of [the statute's] provisions." 1 Pa.C.S. §1921(a). An interpretation which relegates a term to the status of surplusage is, on that ground alone, to be rejected. *Wiernik v. PHH U.S. Mortg. Corp.,* 736 A.2d 616 (Pa. Super. 1999), *appeal denied,* 561 Pa. 700, 751 A.2d 193 (2000).

184. 1. Pa.C.S. §1921(a).

185. See Webster's Third New International Dictionary at p. 1899 (G. & C. Merriam Co. 1966).

ever, in our view, the express content and form of Code §3703 requires redirection of the analysis to whether each of the proposed uses may be properly categorized as a public park, a parkway, a playground, a playfield, a gymnasium, a public bath, a swimming pool, or an indoor recreation center. Many of the uses contemplated as components of the regional family recreation complex defy such categorization. We would be required to reject a contention by the city that it is empowered to condemn land outside of its boundary for every use here contemplated as a component of the regional family recreation complex, excepting only the hotel and conference center.

The issue as we have reformulated it in response to the amendment to the declaration of taking which we will require, is whether Code §3703[186] authorizes the extraterritorial condemnation of lands for a golf course or directly ancillary facility. As we will discuss in greater detail below in connection with the Sahas' challenge to the "public" nature of the regional facility, in *Dornan v. Philadelphia Housing Authority,* 331 Pa. 209, 221-22, 200 A. 834, 840 (1938), the court stated directly (albeit in obiter dicta) that "[t]he taking of land for a public golf course . . . would be for a public use . . . ."

Moreover, in *Bernstein v. Pittsburgh,* 366 Pa. 200, 77 A.2d 452 (1951), the issue was whether the construction of an open-air auditorium by the city in its Schenley Park in order to lease the same to a private concern who would then charge admission for the presentation on summer evenings of light opera, could properly be undertaken

---

186. 53 P.S. §38703.

under a restricted grant of the land "for the use of the people of Pittsburgh and the public as a public park . . . ."[187] The court first holds that the project is authorized as a "public auditorium" within the intendment of a permissive provision of the city's enabling legislation as it then was,[188] writing:

"The structure here planned is undoubtedly an 'auditorium,' which has been defined as any large room, hall or building more especially designed for use for lectures and dramatic and musical entertainments. Moreover it is a *public* auditorium since the title and control of the use of the building remain at all times in the City of Pittsburgh; the Opera Association agrees that even during the summer months it will not interfere with the city's use of the building for other public purposes when not actually in use for the operatic performances."[189]

The court then engages in an extended exegesis of the meaning of the term "public park" within the context of the restricted grant; a meaning which, as the court emphasizes, is narrower in scope in that context than, within an enabling statute but, nevertheless, is sufficiently broad to encompass the contemplated auditorium. As the court reasons:

"[W]hile it is true that, where land is conveyed by the owner to a municipality for park purposes, as distinguished from a situation in which the municipality itself purchases or condemns land and establishes a park thereon, the terms of the grant must be narrowly con-

---

187. *Id.* at 203, 77 A.2d at 453.

188. The Act of July 8, 1919, P.L. 783, 53 P.S. §§1421-25. *Id.* at 205, 77 A.2d at 454.

189. *Id.*

strued and the uses to which the land may be put correspondingly restricted . . . nevertheless, even under that rule of construction, the building of this open-air auditorium in Schenley Park would seem to come well within, and to be in no way inconsistent with, the purposes specified in the deed from Mary E. Schenley as those to which the use of the land so conveyed was to be limited. . . .

"What constitutes a 'public park'—its attributes and dominant characteristics—is very generally understood and must have been likewise understood by Mary E. Schenley. A public park may be defined as a tract of ground kept more or less in its natural state, or embellished by the planting of additional trees, and flowers, and devoted to the purposes of pleasure, recreation and amusement. In ancient times the term 'park' was applied to an enclosed tract stocked with beasts of the chase, such as that described by Xenophon as belonging to Cyrus, King of Persia, but, as humorously pointed out by Mr. Justice Dean in *Commonwealth v. Hazen,* 207 Pa. 52, 57, 56 A. 263, 265 [(1903)], the ordinary citizen of today does not obtain his notion of a park from a reading of the Anabasis. In modern times the principal purpose of a park, namely, public recreation, is not limited to physical recreation but includes aesthetic recreation and mental and cultural entertainment as well. While the entire park acreage or any substantial part of it cannot, of course, be built upon so as unduly to destroy the enjoyment of fresh air, sunshine and exercise, the erection within its borders of monuments, museums, art galleries, public libraries, zoological and botanical gardens, conservatories, and the like, is commonly recognized and accepted as being within the normal scope and ambit of

public park purposes, and an open-air public auditorium comes within the same category as such other permissible structures . . . . Nor is the propriety of the operation of enterprises of that nature within the park limits militated against by the fact that patrons may be obliged to pay for admission thereto; in Schenley Park itself there have been maintained for many years a public golf course, a restaurant in connection therewith, a swimming pool, tennis courts, a bowling green, a riding academy, and occasional flower shows, for the use of all of which, as also for boat rentals on the lake, charges have been exacted, and this without challenge by either the representatives of the Mary E. Schenley estate or by her heirs, or any one else; the Phipps Conservatory, which also is located in Schenley Park, makes admission charges at certain times, and the same is true in connection with some of the entertainments given in Carnegie Music Hall which is a part of the Carnegie Free Library Building." *Id.* at 205-207, 77 A.2d at 455.

There can be little doubt that the "golf and golf-related" facilities here contemplated by the city are encompassed within the statutory authority to acquire land as and for public parks.

To the same effect, the case reported as *New Castle v. Lawrence County,* 353 Pa. 175, 44 A.2d 589 (1945), involved the scope of the General Assessment Law's exemption from real estate taxation of "public property used for a public purpose" [190] as well as those provisions of

_____

190. The court in *New Castle* sets forth the controlling statute as follows:

"The General Assessment Law of May 22, 1933, P.L. 853, 72 P.S. 5020-204, provides:

the Third Class City Code, including section 3703 described above, as it then was,[191] authorizing extraterritorial condemnation for the creation of public parks. Our Supreme Court described one of the facilities at issue in the following terms: "[t]he city had converted what had been the City Poor Farm, located in Shenango Township, about 3 1/2 miles from the city, into a municipal golf course, designating it as a 'park, playground and recreation center.' . . . The golf course is open to the general public, whether residents or non-residents of the City of New Castle, residents or non-residents of the township of Shenango, Lawrence County, where the course is located. Fees are charged just as in the use of any ordinary golf course privately owned." *Id.* at 178-79, 44 A.2d at 592. The other city facility made the subject of the litigation is described in the following terms.

"The following property shall be exempt from all county, city, borough, town, township, road, poor and school tax, to wit:

"(g) All other public property used for public purposes, with the ground thereto annexed and necessary for the occupancy and enjoyment of the same, . . . ."

191. The court sets forth the legislative provision at issue as follows:

"The Third Class City Act of 1931, P.L. 932, §3703, 53 P.S. §§12198-3703, provides: Cities may enter upon, take, use, purchase and acquire, by gift or by the right of eminent domain, lands, property and buildings, for the purpose of making, extending, enlarging, and maintaining public parks, parkways, playgrounds, playfields, gymnasiums, public baths, swimming pools, or indoor recreational centers, may levy and, collect such special taxes as may be necessary to pay for the same, and make appropriations for the improvement, maintenance, care, regulation, and government of the same. . . . Lands, property and buildings outside the limits of the city may be taken for the purpose of a park, parkway, or playground, and such lands may be annexed to the city, in the manner provided by this Act for the annexation of territory to a city."

"The Cascade Park situation is somewhat different. This park adjoins the city, contains 74 acres and is improved with a number of buildings. It is used by approximately 200,000 persons a year. Certain concession buildings are let on short term leases or licenses yielding about $3,790 annually, but the park is operated, as the finding states, '. . . at a definite loss to the city.' " *Id.* at 182, 44 A.2d at 593.

In holding both facilities to be exempt from taxation, the court reasoned as follows:

"It is common knowledge that municipalities maintain public golf courses in their parks just as they maintain baseball diamonds, tennis courts, and playgrounds equipped with appropriate devices; it is also common knowledge that, frequently, reasonable charges are imposed, towards reduction of the general maintenance cost. The city has shown its right to immunity from the taxation complained of on the ground the property sought to be taxed is public property for public purposes within the statute." *Id.* at 181, 44 A.2d at 593.

The court directly addresses the issue before us in holding that the "[p]ower to purchase land for a public park includes power to purchase or create a golf course for municipal use . . . ." *Id.* at 178, 44 A.2d at 591. (citations omitted) The condemnees here offer no contrary authority. We overrule the challenge to the city's power under the Code to condemn the Sahas' property for a municipal golf course and uses directly ancillary thereto.

The presence of general statutory authority does not end the matter, however. Irrespective of the terms of the legislative grant of power, Article 1, Section 10 of the Commonwealth's Constitution permits the condemna-

tion of private property only where it is to be devoted to a public use; whatever the more specific description or categorization of that use. *Pennsylvania Mutual Life Insurance Co. v. Philadelphia,* 242 Pa. 47, 88 A. 904 (1913); *Cain v. Aspinwall-Delafield Co.,* 289 Pa. 535, 137 A. 610 (1927). The right of eminent domain does not authorize the government to take the property of one citizen for the mere purpose of transferring it to another, even for a full compensation, when the public is not interested in the transfer; such an arbitrary exercise of power would be an infringement of the constitution, as not being within the power delegated by the people to the legislature. *Faranda Appeal,* 420 Pa. 295, 216 A.2d 769 (1966); *Pittsburgh v. Scott,* 1 Pa. 309 (1845); *Lamberton v. Hogan,* 2 Pa. 22 (1845); *Ervine's Appeal,* 16 Pa. 256 (1851); *Lance's Appeal,* 55 Pa. 16 (1867); *Palairet's Appeal,* 67 Pa. 479 (1871); *Borough of Big Run v. Shaw,* 16 Pa. Commw. 623, 330 A.2d 315 (1975).

The condemnees here contend that the golf course and related uses proposed by the city are not "public" in the sense required to support the exercise of the power of eminent domain because the uses are intended to operate at a surplus of revenues over expenses and in direct competition with private, commercial golf facilities in the region.[192] On this subject, the city's manager testified that it is the city's intent to operate the golf course and the golf-training facility so as "to generate additional funds beyond [their] costs"[193] so as to produce a surplus to the general fund and, thereby, "reduce [the] load of

---

192. See preliminary objections at ¶¶3(c), (u), (v), and (aa).
193. Janssen pp. 284-85.

taxes off of our residents;"[194] assertedly subject to "the highest taxing rates present outside of the City of Philadelphia in the southeastern Pennsylvania area."[195]

These are the precise issues left unresolved by the court in *New Castle,* the court there writing:

"The decree, so far as it relates to Sylvan Heights Golf Course, denies exemption on a theory as we understand it, that there was no public use, within the meaning of the constitution and enabling legislation, but that, on the contrary, the city was engaged in a business enterprise competing with privately operated golf clubs. Without now considering what the effect of such a fact might require, we limit our consideration to the record which does not support the fact of business activity on which the theory is based and which must therefore be rejected. Referring to this subject, Judge Dickey said in his adjudication, 'It is to be regretted that the record in this case affords little aid to the court in determining whether this course is operated in direct competition with commercial golf courses in the neighborhood. It has all the earmarks of a commercially operated golf course. It has never returned a profit, but we are acquainted with but few municipally managed properties that are profitable.' While, as he said, the record afforded 'little aid' to him, the court in banc went further: We are not aware of our appellate courts yet having held a golf course to be property used for public or governmental[1] purposes. Furthermore, the Sylvan Heights Golf Course, though municipally owned and operated was in direct competition with private enterprises of the same type and kind situate

194. Janssen p. 285.
195. *Id.*

within Lawrence County. The use of public property in competition in the same business with private property is not and ought not to be looked upon with favor. No greater discouragement to individual enterprise could exist. Further, it is through individual enterprise that the necessary revenue is derived by which government is carried on. . . .

" 'As to the right of the general public to use the facilities of the Sylvan Heights Golf Course, that right was contingent upon individuals' ability to pay the "greens fee," and it therefore cannot be said that the course was open to the free use of the general public. It appears to us that the Sylvan Heights Golf Course was used mainly for the convenience of the restricted class of individuals who play golf rather than for a general public purpose.' The record does not support those inferences; the evidence which Judge Dickey 'regretted' was not in the record cannot be made the basis of inference.

---

"1. This indicates some confusion of thought on the subject because 'The city acts in its corporate or proprietary capacity in maintaining its parks.' *Honaman v. Phila.*, 322 Pa. 535, 539, 185 A. 750[, 751]." *New Castle* at 180-81, 44 A.2d at 592-93.

It must be recalled that *New Castle* concerned the interrelated issues of whether the golf facilities there involved were "public" within the intendment of section 3703 of the Third Class City Code as well as whether they were "public" within the intendment of the statutory exemption from real estate taxation. Only the former characterization is here pertinent. The latter issue must

be resolved with reference to whether the taxpayer is a "purely public charity," a term of art within Article 8, Section 2(a)(v) of our Constitution as well as the particular legislative criteria codified at 72 P.S. §5020-204(a)(3), considerations entirely inapposite to our present purposes.[196]

The seminal discussion of the meaning of the limiting term "public purpose" in the context of the proper exercise of the power of eminent domain, is found in the decision of our Supreme Court reported as *Dornan v. Philadelphia Housing Authority*, 331 Pa. 209, 200 A. 834, (1938); a challenge to the then recently enacted Housing Authorities Law; the Act of May 28, 1937, P.L. 955;[197] Pennsylvania's legislative response to the Act of Congress of September 1, 1937, known as the United States Housing Act of 1937[198] "designed to accomplish, or at least facilitate, through the instrumentality of public agencies, the elimination in Pennsylvania of unsafe, unsanitary, inadequate and overcrowded dwellings, and to substitute in their stead decent habitations for persons heretofore compelled to live in slum areas." *Id.* at 212-13, 200 A. at 835. (footnote omitted)

The court begins its extensive discussion with the following statement of the issue and position of the taxpayer protestants.

---

196. Moreover, as the court noted in *Easton v. Koch,* 152 Pa. Super. 327, 31 A.2d 747 (1943), a traditional statutory exemption from taxation has been afforded to "[a]ll public parks when owned and held by trustees for the benefit of the public, and used for amusements, recreation, sports and other public purposes *without profit.*" *Id.* at 331 n.2, 31 A.2d at 749 n.2. (emphasis added)

197. Then codified at 35 P.S. §1541.

198. 50 Stat. 888, then codified at 42 U.S.C. §1401.

"In the determination of one fundamental question will be found also the answer to the more important of the specific objections raised by plaintiff to the constitutionality of this legislation. Does the use to which the property acquired by the housing authorities will be devoted constitute a '*public* use' within the legal definition of that term? It is plaintiff's contention that the buildings to be erected by the housing authorities will not be used by the general public but only by a comparatively few persons of a class limited to those of low income, and, while conceding that the construction and renting of the new dwellings to such persons may constitute a public *benefit,* plaintiff maintains that their *use* will not be a public one, and that, therefore, the land upon which they are to be erected cannot be acquired under the power of eminent domain, without which power, it is conceded by defendant housing authority, it will be impossible to make the legislation practically operative." *Id.* at 216-17, 200 A. at 838. (emphasis in original)

There follows an analysis, complete with citations to the illustrative appellate decisions in this and other jurisdictions, of the two principled positions or "schools of thought" on the meaning of the term "public purpose"; that is, that a purpose is public only if available to the public generally, on the one hand, and that a purpose is public if it provides some advantage to the public welfare, on the other. The court describes the debate in the following terms:

"The disagreement over the meaning of 'public use' is based, largely upon the question of the sense in which the word 'use' in the constitution was intended to be understood, and has developed two opposing views, each

of which has its ardent supporters among the text writers and courts of last resort. The supporters of one school insist that 'public use' means 'use by the public,' that is, public service or employment, and that consequently to make a use public a duty must devolve upon the person or corporation seeking to take property by right of eminent domain to furnish the public with the use intended, and the public must be entitled, as of right, to use or enjoy the property taken. . . . On the other hand, the courts that are inclined to go furthest in sustaining public rights at the expense of property rights contend that 'public use' means 'public advantage,' and that anything which tends to enlarge the resources, increase the industrial energies, and promote the productive power of any considerable number of the inhabitants of a section of the state, or which leads to the growth of towns and the creation of new resources for the employment of capital and labor, manifestly contributes to the general welfare and the prosperity of the whole community, and, giving the constitution a broad and comprehensive interpretation, constitutes a public use." *Id.* at 217-18, 200 A. at 838.

While conceding that statements consistent with each of these schools can readily be found in its prior opinions, a number of which are cited and discussed in detail, the court ultimately concludes that the more permissive school represents the better view.

"On the whole, although the cases on this subject in Pennsylvania have been comparatively few in number, it may fairly be stated that, while firmly maintaining the principle that private property cannot be taken by government for other than a public use, they justify the con-

clusion that judicial interpretation of 'public use' has not been circumscribed in our state by mere legalistic formulas or philological standards. On the contrary, definition has been left, as indeed it must be, to the varying circumstances and situations which arise, with special reference to the social and economic background of the period in which the particular problem presents itself for consideration. Moreover, views as to what constitutes a public use necessarily vary with changing conceptions of the scope and functions of government, so that today there are familiar examples of such use which formerly would not have been so considered. As governmental activities increase with the growing complexity and integration of society, the concept of 'public use' naturally expands in proportion." *Id.* at 221, 200 A. at 840.

The court expressly rejects as having "little or no weight" and as "wholly lacking in legal significance" the consideration "that the dwellings cannot and will not be occupied by all, but only by a few of the public having the prescribed qualification of poverty." [199] The court continues: "[n]or is importance to be ascribed to the circumstance that some persons—the tenants—will from time to time receive more benefit from the use of the dwellings than the general public." *Id.* As proof of the insignificance of these circumstances, the benefit accruing to only a small number of persons who receive a greater benefit than the general public, the court draws the following analogy.

---

199. *Dornan* at 221, 200 A. at 840. On this basis, we could not in this context give any decisive effect to the apparent intent to primarily benefit non-resident golfers, expected to utilize the vast majority of the available time on the course.

"The taking of land for a public golf course or playground would be for a public use although, while some players are using it, all other members of the public are necessarily excluded from utilizing and enjoying the facilities. The difference in the duration of occupancy in these various instances is one of degree. It is not essential that the entire community or even any considerable portion of it should directly enjoy or participate in an improvement in order to make its use a public one . . . ." *Id.* at 221-22, 200 A. at 840.

While clearly unnecessary to the court's decision of the issues actually presented in the case, a trial court could hardly wish for a statement of greater clarity and applicability from the tribunal of ultimate jurisdiction in this matter.

Moreover, with all of the distinctions outlined above there underscored, in the end we are of the view that this challenge of the condemnees to the public nature of the proposed golf facilities, like that in *New Castle,* is inappropriate for decision on this record. Whether the golf course and related uses are or are not operated as a "public" facility is not capable of resolution on the basis of statements of intent. Without regard to the hopes and expectations of city officials, this facility may exemplify the typical reality described in the trial judge's statement, quoted by the *New Castle* court in the excerpt set forth above that "we are acquainted with but few municipally managed properties that are profitable." This is a matter not of hopes or projections but of the manner of operation of the facility and the degree of its success. If *Dornan* stands for nothing else in this regard, it clearly establishes that municipal golf courses and related uses are

*capable* of development as "public parks" within the intendment of Third Class City Code §2703. Only this limited issue is here raised.

Finally with respect to this challenge we note that there can be no doubt that the city has here set a bold and creative course in its attempt to address the larger societal and economic forces that have so adversely affected its citizens. The direction to be taken is depicted graphically in the revitalization plan admitted into the record of these proceedings as exhibit "Saha-41." As we emphasized at the outset, it is not for this court to judge the wisdom or likelihood of successful completion of these projects. Neither is their very novelty, breadth, or boldness grounds for judicial intervention. As the court wrote in *Dornan:*

"A legislative project of this nature goes beyond anything heretofore attempted in this state. It naturally invites, therefore, the attack of those who are inclined to regard all experiments in our social and economic life as presumptively unconstitutional. Such challenges must fail, however, if, upon analysis, it appears that the only novelty in the legislation is that approved principles are applied to new conditions. Neither our state nor our federal constitution forbids changes, merely because they are such, in the nature or the manner of use of methods designed to enhance the public welfare; they require only that the new weapons employed to combat ancient evils shall be consistent with the fundamental scheme of government of the Commonwealth and the nation, and shall not violate specific constitutional mandates." *Dornan,* 331 Pa. at 213, 200 A. at 836-37.

We overrule the condemnees' challenge to the public nature of the purpose for which their lands have here

been taken without prejudice to the renewal of this contention by some appropriate procedural vehicle if warranted by the circumstances of the actual management and operation of the facility.[200]

This brings us to the final set of objections, grounded in such authorities as *Winger v. Aires,* 371 Pa. 242, 89 A.2d 521 (1952), in which the condemnees contend that the city's actions in condemning their lands and in the particular configuration of the portion of their lands excepted from the condemnation, represent, in various respects, the arbitrary and capricious exercise of discretion inadequately premised on reason or an investigation into the pertinent factual and legal circumstances. In *Winger,* a taxpayer suit seeking to enjoin a school district's condemnation of a 55 acre farm for the purpose of constructing thereon a new elementary school, the court wrote, by Mr. Justice Musmanno, the following memorable cautionary instructions to condemnors:

200. The condemnees have no standing to challenge the city's actions as in unlawful competition with private golf courses. *Thompson Appeal,* 427 Pa. 1, 4, 233 A.2d 237, 239 (1967). Moreover, the Third Class City Code contains no express anticompetitive prohibition as is found, for example, in the provision of the Municipal Authorities Act of 1945, Act of May 2, 1945, P.L. 382, *as amended,* 53 P.S. §301 et seq., here relied upon by the condemnees. Preliminary objections at ¶3(aa). See section 4 of the Act, 53 P.S. §306(A):

"The purpose and intent of this Act being to benefit the people of the Commonwealth by, among other things, increasing their commerce, health, safety and prosperity, and not to unnecessarily burden or interfere with existing business by the establishment of competitive enterprises, none of the powers granted by this Act shall be exercised in the construction, improvement, maintenance, extension or operation of any project or projects which in whole or in part shall duplicate or compete with existing enterprises serving substantially the same purposes."

"The appellants do not question, and indeed cannot question, that the school board has the power by this statute and under the Constitution of the Commonwealth itself, to take private property for school building purposes. They do, however, challenge the extent of that power, and properly so. There is no authority under our form of government that is unlimited. The genius of our democracy springs from the bedrock foundation on which rests the proposition that office is held by no one whose orders, commands or directives are not subject to review. The power of eminent domain, next to that of conscription of man power for war, is the most awesome grant of power under the law of the land. Article 1, Section 10 of our Pennsylvania Constitution, declares: '. . . nor shall private property be taken or applied to public use, without authority of law and without just compensation being first made or secured.'

"It is to be emphasized, however, that the restriction in this clause is not *limited* to the guarantee of just compensation. The condemnation may not take place at all without authority of law.

"Did the School Board of Ephrata have authority of law to take 55 acres of land for a school building which would accommodate 65 pupils?

"Although the board here proceeded vigorously in the assumed interests of the people of the borough, the zeal exercised in the execution of its duties was as excessive as its knowledge of the law applicable to the situation was lacking.

"One witness testified, for instance, that the vice president of the board said that the board could take more land than it needed for the school building and then sell

what remained over. Obviously no school board can, even in this indirect fashion, go into the real estate business.

"The record shows quite clearly that the board moved precipitately and without adequate preparation for the exercise of so solemn a power as that of eminent domain. No definite plans had been formulated as to the use to be made of the 55 acres. Although the board knew that so vast an acreage could swallow up one building and many more, no specifications as to the proposed building had yet been indicated; no architect had been retained, and no surveys of the property had been made. Nor had any definitive location on the tract been designated for the intended structure. A bond issue of $150,000 had been approved at the election of November 1950, for the purpose of purchasing land and constructing a school building, but no estimate of construction costs was yet available.

"The darkness in which the directors moved in this most serious business of condemnation of private property was further evidenced by the fact that, although it was generally admitted 55 acres was excessive acreage for the public use intended, the directors were prepared to condemn 71 acres for that purpose had they known the plaintiffs owned an additional tract of 16 acres, title to which was not recorded at the time." *Id.* at 244-45, 89 A.2d at 522-23. (emphasis in original)

On these bases, the court concluded:

"Although there is a presumption that school directors perform discretionary acts in the interests of public welfare and that their decisions have been reached by the exercise of intelligent judgment and in a legal manner after suitable investigation . . . the evidence in this

case overcomes that presumption and leads inevitably to the conclusion that the action of the School Board of Ephrata constituted an abuse of discretion in its exercise of the power of eminent domain." *Id.* at 246-47, 89 A.2d at 523.

Much of the effort of the condemnors here has been devoted to an attempt to create evidentiary parallels between the city's deliberations and those censured so soundly in *Winger.* These efforts yielded some fruit. For example, the record fails to provide any meaningful explanation for the initial inclusion of the condemnees lands among those to be condemned pursuant to the ordinance passed on first reading on April 12, 1999.[201] Equally unexplained are the inclusion in the condemnation authority created by that proposed legislation of the condemnees' home and the omission therefrom of the

---

201. It must be recalled that the Carroll Engineering feasibility study of February 17, 1999, the only study completed prior to city council's decision to condemn the Sahas' lands, contained the opinion that additional lands were necessary beyond those studied in order to develop the recreational uses contemplated. The study further recommended the consideration of particular parcels for acquisition in order to remedy this deficit. The recommended additional lands, labeled "optional additional parcels" on graphic exhibits to the study denominated land use plans, included seven tax parcels but did not include the Sahas' lands either in Valley Township or in West Caln Township. The process by which the Sahas' lands gained inclusion as an optional additional parcel recommended for acquisition including the reasons for dissatisfaction with the recommendation as formalized in the study, the identity of the person who instructed Carroll Engineering to consider the expansion of its recommended list of additional parcels and the nature of those instructions, and the chronology of these events, remains a mystery on this record. As Mr. Dunlevy testified: "the Saha [property] was not considered in the original feasibility study." Dunlevy p. 30. Accord Janssen p. 218.

condemnees' lands in West Caln Township. On the other hand, it is clear, for example, that members of city council, much like the Ephrata School Board vice president, saw no upper limit to the amount of land it might reasonably appropriate to these purposes by condemnation.[202] Additionally, the city's bond issue, like that of the school district, is unsupported by definite plans of the use to be made of the lands acquired, final decisions as to the location of proposed structures, building designs or plans, or definitive estimates of construction cost.

For all of these similarities, however, we do not believe that the condemnees have brought within the condemnatory rule of *Winger* the city's initial decision to condemn their lands as and for a municipal golf course. We must again emphasize, as we did at the outset in the discussion of our limited judicial role, that the authorities are many and uniform for the proposition that the wisdom of the condemnor's decision or the details of the manner adopted to carry that decision into effect are matters into which courts have no power to inquire. *Faranda Appeal,* 420 Pa. 295, 300, 216 A.2d 769, 771-72 (1966); *Hyam v. Upper Montgomery Joint Authority,* 399 Pa. 446, 455-56, 160 A.2d 539, 545 (1960), *cert. denied,* 364 U.S. 288, 81 S.Ct. 50, 5 L.Ed.2d 38 (1960); *Eways v. Reading Parking Authority,* 385 Pa. 592, 597, 124 A.2d 92, 94-95 (1956); *Blumenschein v. Pittsburgh Housing Authority,* 379 Pa. 566, 572-73, 109 A.2d 331, 334 (1954), *cert. denied,* 350 U.S. 806, 76 S.Ct. 68, 100 L.Ed. 724

---

202. An extensive catalog of the supportive record references is provided by the condemnees in their principal brief at p. 21 including DeSimone pp. 74, 84-85, 101-104, 106, 144, 172; Dunlevy pp. 29, 72, 106; Green p. 43; Griffith pp. 62, 148, 153, 156; Hines p. 137.

(1955) (footnotes omitted) ("By a host of authorities in our own and other jurisdictions it has been established as an elementary principle of law that courts will not review the actions of governmental bodies or administrative tribunals involving acts of discretion, in the absence of bad faith, fraud, capricious action or abuse of power; they will not inquire into the wisdom of such actions or into the details of the manner adopted to carry them into execution.") Indeed, in *Dornan v. Philadelphia Housing Authority,* the court opined that so long as the object is lawful, the exercise of the power of eminent domain designed to achieve that object must also be lawful. *Id.* at 228, 200 A. at 843. To the same effect, see *McSorley v. Fitzgerald,* 359 Pa. 264, 271, 59 A.2d 142, 146 (1948).

The most thoroughly elaborated statement of the position last stated above, that condemnation is simply a means to an end and, therefore, the legitimacy of the end legitimizes the means, can be found in the opinion of the United States Supreme Court reported as *Berman v. Parker,* 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954),[203]

---

203. The Pennsylvania Commonwealth Court describes the discussion of this issue in the *Berman v. Parker* opinion as "excellent" in *Harford Township v. Bandurick,* 660 A.2d 189, 191 n.6 (Pa. Commw. 1995). A more recent discussion in the United States Supreme Court of the proper scope of the eminent domain power can be found in *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 240, 104 S.Ct. 2321, 2329, 81 L.Ed.2d 186 (1984) (quoted as authoritative in *In re Marivitz,* 161 Pa. Commw. 247, 253, 636 A.2d 1241, 1244 (1994)) involving a challenge to that state's Land Reform Act of 1967 which authorized the condemnation of leased parcels greater than five acres in area on petition of, and for the purpose of, transferring title to the lessees. Interestingly, in upholding condemnations under the Act as for a "public purpose," the court found instructive this Commonwealth's

affirming the dismissal of a complaint which sought to enjoin the condemnation of an improved commercial property and challenged the constitutional validity of the District of Columbia's Redevelopment Act of 1945[204] primarily on the ground that the redevelopment "project [will be] under the management of a private, not a public, agency and [the challenger's property will be] redeveloped for private, not public, use."[205] Mr. Justice Douglas, after noting that the challenged Act's statement of legislative findings included the following: "the acquisition and the assembly of real property and the leasing or sale thereof for redevelopment pursuant to a project area redevelopment plan . . . is hereby declared to be a public use"[206] reasoned as follows for the court:

"Subject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive. In such cases the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation, whether it be Congress legislating concerning the District of Columbia . . . or the states legislating concerning local affairs. . . . This principle admits of no exception merely because the power of eminent domain is involved. The role of the judiciary in determining whether that power is being ex-

---

Divesting Act of 1779 by which the then colony "took steps to eradicate the feudal incidents with which large proprietors had encumbered land. . . ." *Hawaii Housing Authority v. Midkiff,* 467 U.S. at 242 n.5. We have discussed the proprietary nature of Colony of Pennsylvania in our decision filed simultaneously herewith in *Valley Township v. City of Coatesville,* no. 01-09098; slip op. at p. 28 n.57.

204. Then codified at 60 Stat. 790, D.C. Code §§5-701 through 5-719. *Id.,* 348 U.S. at 29.

205. *Id.,* 348 U.S. at 31.

206. *Id.,* 348 U.S. at 29.

ercised for a public purpose is an extremely narrow one. . . . Public safety, public health, morality, peace and quiet, law and order—these are some of the more conspicuous examples of the traditional application of the police power to municipal affairs. Yet they merely illustrate the scope of the power and do not delimit it. . . .

"We do not sit to determine whether a particular housing project is or is not desirable. The concept of the public welfare is broad and inclusive. . . . The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled. In the present case, the Congress and its authorized agencies have made determinations that take into account a wide variety of values. It is not for us to reappraise them. If those who govern the District of Columbia decide that the nation's capital should be beautiful as well as sanitary, there is nothing in the Fifth Amendment that stands in the way. *Once the object is within the authority of Congress, the right to realize it through the exercise of eminent domain is clear. For the power of eminent domain is merely the means to the end. . . . Once the object is within the authority of Congress, the means by which it will be attained is also for Congress to determine.* Here one of the means chosen is the use of private enterprise for redevelopment of the area. Appellants argue that this makes the project a taking from one businessman for the benefit of another businessman. But *the means of executing the project are for Congress and Congress alone to determine, once the public purpose has been established.* . . .

*"Once the question of the public purpose has been decided, the amount and character of land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch.* . . . The district court indicated grave doubts concerning the agency's right to take full title to the land as distinguished from the objectionable buildings located on it . . . . We do not share those doubts. If the agency considers it necessary in carrying out the redevelopment project to take full title to the real property involved, it may do so. It is not for the courts to determine whether it is necessary for successful consummation of the project that unsafe, unsightly, or insanitary buildings alone be taken or whether title to the land be included, any more than it is the function of the courts to sort and choose among the various parcels selected for condemnation. The rights of these property owners are satisfied when they receive that just compensation which the Fifth Amendment exacts as the price of the taking." [207]

It could certainly be argued that the views expressed as to the proper judicial role in *Winger v. Aires* and in *Berman v. Parker* are fundamentally inconsistent. There was no issue taken in *Winger* with the school districts' power to condemn land as the location of a new elementary school. As Mr. Justice Musmanno conceded: "[t]he appellants do not question, and indeed cannot question, that the school board has the power by this statute and under the Constitution of the Commonwealth itself, to take private property for school building purposes." [208] Taken at its word as exemplified by the excerpted opin-

---

207. *Id.,* 348 U.S. at 32-37. (citations omitted) (emphasis added)
208. *Winger v. Aires* at 244, 89 A.2d at 522.

ion quoted above, this concession would, for the court in *Berman v. Parker,* end the matter. The legality of the object would legitimize the means.

However, in our view, the rule of *Berman v. Parker* admits of two implicit provisos. The first of these is that the means legitimized by the legality of the object is only that means reasonably necessary to serve that object. That is, the legality of the project type, be it a public road, a school facility, a courthouse, or a park, even accepting the general validity of the principle elaborated in *Berman v. Parker,* legitimizes the condemnation of only so much land as is reasonably required to accomplish the legitimate goal. In our view, this is the true basis of *Winger v. Aires;* the court's conclusion that too much land was condemned. While the condemnees here assert that their land is unnecessary to serve the city's purpose,[209] no evidence or expert opinion was adduced by the condemnees in support of this contention and the city's evidence of necessity, while admitting to many of the technical criticisms advanced by the condemnees, is more than sufficient to preclude the substitution of judicial discretion for that of the municipal legislature. We overrule the preliminary objections challenging the quantum of land taken as unnecessary for the purposes described.

The second implicit qualification to the principle expressed in *Berman v. Parker* is grounded in essential ideas of due process of law and is that the legislative decision to condemn private property, just like legislative decisions generally, must not be arbitrary, capricious, or ac-

---

209. See preliminary objections at ¶3(f), (g), (m) and (n).

tuated by fraud, prejudice, bad faith or other impermissible motive.[210]

With this gloss, we accept the restricted judicial role described by the court in *Berman v. Parker.* We disavow any judicial inquiry encompassing the detailed particulars of the city's decision-making process and the manner in which specific aspects of the project evolved from conception to legislative fact. For example, the condemnees make much of the fact that no "golf course architect"[211] was retained by the city until sometime after the enactment of ordinance no. 1132-2000. However, in *Faranda Appeal,* 420 Pa. 295, 216 A.2d 769 (1966), the court rejected a materially identical objection grounded in the failure of the condemnor in that case to have either selected a redeveloper or to have entered into a redevelopment contract at the time the lands were condemned for the redevelopment project. The court held that such objections, essentially asserting the necessity of proce-

---

210. See *Blumenschein v. Housing Authority of Pittsburgh,* 379 Pa. 566, 572-73, 109 A.2d 331, 334-35 (1954), *cert. denied,* 350 U.S. 806, 76 S.Ct. 68, 100 L.Ed. 724 (1955); *Matter of Township of East Hanover,* 701 A.2d 313 (Pa. Commw. 1997), *appeal denied sub nom. In re Township of East Hanover, Petition of Chesapeake Estates Partnership,* 555 Pa. 723, 724 A.2d 937 (1998); *E-V Company Appeal,* 117 Pa. Commw. 475, 478-79, 544 A.2d 87, 89-90 (1998), *aff'd, Matter of Condemnation By Urban Redevelopment Authority of Pittsburgh,* 527 Pa. 550, 594 A.2d 1375 (1991), *cert. denied sub nom. E-V Co. v. Urban Redevelopment Authority of Pittsburgh,* 502 U.S. 1004 (1991).

211. Condemnees' brief in support of preliminary objections at section 111(A), pp. 31 et seq.; condemnees' reply brief at pp. 2-3. Our research has failed to disclose any statutory recognition of such a specialty. Apparently, any architect, landscape architect (or civil engineer) who concentrates on the design of golf courses in his or her professional practice and achieves some success is properly referred to as a "golf course architect (or engineer)." Dunlevy pp. 179-80.

dural steps not found in the Eminent Domain Code, were to no avail. *Id.* at 299, 216 A.2d at 771. Similarly, in *In re Condemnation by Penn Township,* the condemnees presented expert testimonial evidence, apparently unrebutted, that completion of engineering and traffic studies was a necessary predicate to a reasoned decision to embark on a road improvement project of the type at issue for which the protestants' lands had been condemned. Nevertheless, the court, emphasizing the narrow scope of judicial review and the deference that must be given to the personal experience and knowledge of elected officials, affirmed the dismissal of the condemnees' preliminary objections.

In *Speicher Condemnation Appeal,* 58 Pa. Commw. 321, 428 A.2d 282 (1981), and in *Stubbs v. Snyder Township,* 25 Pa. Commw. 613, 616, 361 A.2d 464, 465 (1976), the court held that neither cost estimates nor feasibility studies are a necessary prerequisite to a valid condemnation and in *Downingtown Area School District v. DiFrancesco,* 125 Pa. Commw. 264, 557 A.2d 819 (1989),[212] the failure of the condemnor to abide by the site selection criteria it had promulgated was held to be insufficient to justify judicial intervention; citing *Speicher* and concluding that "[m]ere evidence that a

212. Reversing the decision of this court which improperly relied on the fact (said by the appellate court to be supported by the record) that "the only written report submitted by [the expert consultant] before the condemnation did not include the property condemned . . . ." *Id.* at 268, 557 A.2d at 821. The condemnees here invite us to infer arbitrariness and caprice from a materially identical absence of reference to their lands in the only report submitted by Carroll Engineering prior to the decision to condemn made the subject of the ordinance of April 12, 1999. We decline to repeat the error condemned in *DiFrancesco.*

decision is unwise will not warrant a conclusion that a condemnor has abused its discretion in its selection of a site." *Id.* at 270, 557 A.2d at 822.

Finally, the condemnees devote considerable resources in an attempt to undermine the validity of the estimates of construction and land acquisition expense provided to city council by its consultants and finance director. However, in *Hyam v. Upper Montgomery Joint Authority,* 399 Pa. 446, 160 A.2d 539 (1960), the court held that evidence of a construction cost estimate variance of more than 300 percent would not support, much less compel, judicial interference with a condemnation in the absence of allegation and proof of fraud or misconduct on the part of municipal officials. *Id.* at 454, 160 A.2d at 544.

We find to be more telling, the condemnees' challenge to the reasonableness of, and support for, the city's decision to except a portion of their property from the condemnation as well as the area, configuration and location chosen for the excepted parcel.[213] We must begin our analysis of this

---

213. At argument, the city's special counsel suggested that when viewed in the light of the city's power to condemn (as well as the record justification for the condemnation) of the whole of the Sahas' lands and council's expressed intent to minimize the adverse effect on the Sahas by excepting their home and its curtilage, this challenge exemplifies the rule that "no good deed goes unpunished," an ironic aphorism usually attributed to Oscar Wilde. Brewer's Quotations (Cassell 1997) at pp. 353-54. We do not examine, much less question, council's motives. As we will discuss in more detail momentarily, we hold only that council must achieve its chosen ends by means in compliance with governing law. For example, in those instances where the means adopted by council involve the creation of a subdivision of land within a municipality which has enacted an ordinance pursuant to article 5 of the MPC, then council must comply with that ordinance. Additionally, whatever the chosen end, council's means must be formulated rationally, without the arbitrariness, caprice, or improper motives that are among the hallmarks of a deprivation of due process

challenge with reference to our decision and order entered simultaneously herewith and docketed to the case captioned *Valley Township v. City of Coatesville,* no. 01-09098, in which we have overruled the city's preliminary objections interposed with respect to the complaint seeking declaratory relief filed by Valley Township. In this complaint, Valley Township asserts that the city's actions described above with respect to the Sahas' property and, particularly, the use of condemnation to create out of the previously undivided property a six-acre, rectangular lot for retention by the Sahas while transferring ownership of the remainder to the city as condemnor, constituted a "subdivision" within the intendment of the MPC and the township's Subdivision and Land Development Ordinance; and, as such, was required to be (but was not) preceded by the city's submission and the township's review and approval of an application for subdivision approval.

The township's complaint, to which we have now required the city to responsively plead, requests a declaration that the city's condemnation of a portion of the Sahas' lands as described was, in legal effect, an unpermitted, and therefore, illegal, subdivision. In the township's view, this matter assumes particular significance because the subdivided lot created by the city for retention by the Sahas, which is configured as a disconnected "island" entirely surrounded by condemned lands to be titled in the city and incorpo-

---

of law. For example, where council expresses the intent to create a lot of sufficient size for a particular use under the zoning regulations of the jurisdictional municipality, then it is incumbent on the legal and engineering experts who carry council's intent into the reality of draft ordinances and engineered plans, to consult that municipality's regulations and to make, at the least, a reasonable attempt to comply with them and the failure so to do when it results in the direct violation of council's directive, is arbitrary, capricious, and an abuse of discretion.

rated into the regional recreation facility, is violative of mandatory subdivision design regulations of the township requiring every lot to front on a public street.[214]

Having overruled the city's many objections to Valley Township's complaint, we, thereby, refused to reject in principle the township's position that the city's condemnation of the Sahas' lands constituted an unpermitted and, therefore, unlawful subdivision.[215] In this case, the city defends against the Sahas' materially identical objection on all of the grounds we have rejected in connection with Valley Township's complaint. We here reject those defensive contentions as equally unavailing in this context. Additionally, the city argues that the Sahas have no standing to present and have not preserved the issue of violation of Valley Township's subdivision regulations.

We do not agree that the condemnees have not here preserved the issue of whether the condemnation constitutes an illegal subdivision. In fact, the issue was raised, inter alia, in the condemnees' written and oral arguments as well as in the deposition of the consulting engineer, Russell Dunlevy and City Manager Paul Janssen. In the section of

214. See Valley Township's Subdivision and Land Development Ordinance §605(4)(E).

215. The procedural posture of that case being the city's preliminary objections brought pursuant to Pa.R.C.P. 1028 and 1509 to Valley Township's complaint seeking injunctive and declaratory relief, did not permit a definitive ruling on any issue. We overruled the city's objections and directed the filing of a responsive answer. Nevertheless, the practical effect of our order was to grant much of the declaratory relief sought by the township. For the reasons and on the basis of the authorities cited and discussed in the opinion accompanying our order, we have rejected each of the defensive arguments raised by the city thus far and have held that, as they relate to the Sahas' lands, "the city's actions constitute a 'subdivision' within the intendment of MPC §107 and [Valley Township Subdivision and Land Development Ordinance] §203." slip op. at p. 6.

the transcribed examination of Mr. Janssen, beginning at line 13 of page 328, conducted by the city's special counsel, the witness is asked to comment on each of the arguments the questioner understands the condemnees to have asserted in the proceedings thus far.

"Q: They've also said that the condemnation creates an illegal subdivision under the Valley Township zoning and subdivision ordinances. Is that correct?

"A: I'm not in a position to make a conclusion on that. I do believe that the city is executing eminent domain. I believe that there are clauses in the Valley Township ordinance which cause a conflict of where the [lot?] lines are drawn. I also believe that those lines become the subject of a nonconforming use and a nonconforming property.

"Q: Do you know if it's required, before exercising the power of eminent domain when acquiring less than all of a property, to apply for and receive subdivision approval before the filing of the condemnation?

"Mr. Lentz: That's objected to.

"Q: (Continued) You may answer.

"A: In my years of experience in municipal management and having handled the impact of multiple executions of eminent domain along state highways and township roads and through water and sewer condemnations, I have never seen the filing of a subdivision or land development plan associated with the execution of an eminent domain taking." [216]

216. This issue is explored in even greater detail with Russell Dunleavy on both direct and cross-examination including the witnesses' conclusion that subdivision approval was not required to lawfully effect the instant condemnation and the fact that the witness gave to the city no specific advice concerning the regulatory implications of the creation by condemnation of a lot without road frontage in apparent violation of Valley Township Zoning Ordinance §308 as it is found in exhibit "Saha-33." Dunlevy pp. 107-47.

There can be no doubt, therefore, that the issue of the affect of Valley Township's subdivision regulations was raised by the condemnees at a point in the proceedings which offered the city sufficient opportunity (of which the city in fact availed itself) to respond. Mr. Janssen was then asked by the city's special counsel a series of questions concerning the deponent's past experience with multiple condemnations for road and utility projects and his view that regulatory violations created by partial condemnations constitute, and are protected as, lawful nonconforming uses.

"Q: . . . If as a result of the condemnation the property owner was left with a piece of land that no longer conformed to zoning, you're saying that would constitute a nonconforming use?

"A: Yes; automatically."[217]

Following a discussion of registration of nonconforming uses, Mr. Janssen's testimony continues:

"As an example, if a gas station along a state highway lost its front yard because of an expansion of a legal right-of-way by PennDOT or by a township, they would not have the—they may not have the ability to put in a canopy over their pumps because the canopy would be considered a front yard structure at that point instead. So they would come to the municipality and they would register the fact that structure was now considered part of the front yard because the street line stepped back into their property.

"Well, by registering that as a nonconformity they have protected their continuing use of that property and they have also protected their ability to alter and expand that use, and that's what the NPC [sic] provides and that's a typical reaction to a taking that would be done through eminent domain by another public entity."

217. Janssen p. 329.

The hypothetical gasoline station partial condemnation described by Mr. Janssen is strikingly reminiscent of the circumstances of the case reported as *Amoco Oil Co. v. PennDOT,* 679 A.2d 1369 (Pa. Commw. 1996), *appeal denied,* 547 Pa. 758, 692 A.2d 567 (1997), which the court described in the following terms:

"Amoco Oil Co. (Amoco) and Alice Weiss (Weiss) appeal from an order of the court of Common Pleas of Allegheny County (trial court) dated May 23, 1994, denying their motions for post-trial relief in the form of a new trial. We reverse.

"Amoco was a lessee of property owned by Weiss. The property, which was used as a gasoline service station, is located on Ohio River Boulevard, at the intersection of Camp Horne Road, in the Borough of Emsworth (borough), Allegheny County, Pennsylvania.

"Pursuant to section 402(b) of the Eminent Domain Code (Code) the Commonwealth of Pennsylvania, Department of Transportation (DOT), filed a declaration of taking, condemning a portion of the property leased by Amoco. In effect, the taking rounded off the corner of Ohio Boulevard and Camp Horne Road, taking 512 1/2 square feet of the real estate. Amoco ceased operation of its gasoline service station at some time subsequent to the declaration of taking."[218]

Amoco and Weiss each sought and were refused a new trial following the entry of jury verdicts in the amount of $8,000 for Weiss and zero damages for Amoco. Appeals from the denial of post-trial motions were consolidated before the Commonwealth Court which ultimately reverses the order of the trial court on several grounds including the failure of the trial judge to accompany the

---

218. *Amoco Oil Co.,* 679 A.2d at 1371. (footnote omitted)

jury of view in its observation of the property; a procedure held to be mandatory under section 703 of the Eminent Domain Code.[219]

Of interest in the present context is the discussion and ruling of the Commonwealth Court as to the interrelationship between eminent domain and the zoning doctrine of prior nonconforming uses. The landowner asserted that its right to operate a gasoline station had been ended (and, therefore, that its damages were greatly increased) by the condemnation because an effect of the taking was to reduce the lot width and front yard set-back dimensions below the requirements codified in the borough's zoning ordinance. At trial, an expert witness for PennDOT as condemnor gave testimony in opposition to this contention in much the same vein as did the Coatesville city manager in the excerpt above.

"Mr. Francis Chiapetta, a real estate appraiser, also testified for [Penn]DOT. He testified that in his opinion, the property was essentially unaffected by zoning. . . . When asked if he considered that zoning would prohibit use of the property as a service station, Chiapetta responded that he did not. In support of this contention, Chiapetta testified that he was aware of no case in which 'a property [was] shut down' because its use was affected by condemnation. . . . He further stated: 'it has been my experience that [PennDOT] doesn't do that—or that municipalities do not do that.' *Id.*" *Id.*, 679 A.2d at 1376. (record citations omitted)

Just as the city argues in the matter sub judice, PennDOT as condemnor in *Amoco Oil* argued that the doctrine of

219. For an articulate statement of the view that this requirement created by the then newly enacted Eminent Domain Code §703, is an unconstitutional infringement on the power of the judiciary, see *Creasy v. Com.*, 39 D.&C.2d 12, 1965 WL 8217, 114 Pitts.L.J. 105 (1965).

lawful nonconforming uses protects a landowner subject to a partial taking which creates zoning violations. On this basis, PennDOT resisted the condemnees' damages related to cessation of the business for which compensation was claimed before the jury of view. The court analyzes the precise issue here presented; whether zoning illegalities created by partial condemnation are protected as lawful nonconforming uses, in the context of its rejection of each of the three protective theories (nonconformance, variance, and vested rights) potentially available to landowners in such cases, as follows:

"(1) Nonconforming use

"Nonconforming uses are generally protected in the face of changing zoning requirements. See *Appeal of Miller,* 511 Pa. 631, 515 A.2d 904 (1986). It is undisputed that prior to the taking, the subject property was in violation of the zoning requirements regarding lot width and placement of pumps. Evidence in the record indicates that the pumps were less than 20 feet from the curb line and that the width of the lot on Camp Horne Road was 97 feet, four inches. . . . Because these conditions predated the zoning ordinance, the property was in legal nonconformance with these requirements.

"It is also undisputed that the taking has resulted in changes in the dimensions of the property. Condemnees argue that these changes are not protected as nonconforming uses because the zoning requirements existed at the time that the changes were made. Condemnees rely on *Pennsylvania Northwestern Distributors v. Zoning Hearing Board of the Township of Moon,* 526 Pa. 186, 584 A.2d 1372 (1991).

"In *Pennsylvania Northwestern Distributors,* our Supreme Court observed that '[a] lawful nonconforming use establishes in the property owner a vested property right

which cannot be abrogated or destroyed, unless it is a nuisance, it is abandoned, or it is extinguished by eminent domain.' *Id.* at 192, 584 A.2d at 1375; see also, *Bachman v. Zoning Hearing Board of Bern Township,* 508 Pa. 180, 186, 494 A.2d 1102, 1105 (1985) (denying continuance of nonconforming use and stating that owner was 'essentially in the same position as any victim of eminent domain'). In light of these cases, we agree that condemnees' legally nonconforming use of the subject property was extinguished." *Id.,* 679 A.2d at 1376. (record citations omitted)

As suggested, the court then disposes of the variance and vested rights theories as insufficient to establish the landowner's right to operate in violation of the zoning regulations. The *Bachman* case cited by the court is also noteworthy. The facts and procedural history involved in *Bachman v. Zoning Hearing Board of Bern Township,* 508 Pa. 180, 494 A.2d 1102 (1985), are described by that court as follows:

"In 1951, appellant purchased approximately 40 acres of land in Bern Township, Berks County. When he acquired the land there were eight bungalows, one farm house, and two sheds, occupying approximately two of the 40 acres. Near the existing structures he added one bungalow in 1953 and another in 1954. He made improvements to the bungalows in the form of access roads, sewers, water lines, and electricity. Appellant used the farm house as a summer residence and rented the bungalows for both year-round and summer use.

"In 1976, appellant conveyed to the United States, by deed in lieu of condemnation, almost 32 acres of his land, to be used by the government for its Blue Marsh dam project. Appellant retained salvage rights to the bungalows and in the summer of 1977, without benefit of build-

ing or zoning permits, he moved the bungalows to his remaining eight acres. Prior to that time those eight acres contained no structures of any kind.

"Appellant was notified in 1978 that the existence of the bungalows violated the township's zoning ordinance. His subsequent application for a zoning permit was denied by the township's zoning officer. His appeal of that denial was dismissed by the township's zoning hearing board. That dismissal was affirmed both by the Court of Common Pleas of Berks County, 29 D.&C.3d 184, and by the Commonwealth Court, 82 Pa. Commw. 51, 474 A.2d 406 (1984)." *Id.* at 182, 494 A.2d at 1103. (footnote omitted)

The court discusses the issue here of interest, whether the conveyance in lieu of condemnation of the land where the nonconforming use was located had the effect of extinguishing that use, in the following terms.

"Appellant also contests the board's conclusion that the decision to convey his land to the government constituted an extinguishment of the nonconforming use.

"In *Hanna v. Board of Adjustment,* 408 Pa. 306, 183 A.2d 539 (1962), Mr. Justice Jones, speaking for the majority wrote:

"A basic purpose of zoning is to ensure an orderly physical development of the city, borough, township or other community by confining particular uses of property to certain defined areas. With such a purpose nonconforming uses are inconsistent. (citation omitted) The continuance of nonconforming uses under zoning ordinances is countenanced because it avoids the imposition of a hardship upon the property owner and because the refusal of the continuance of a nonconforming use would be of doubtful constitutionality. Even though zoning ordinances permit the continuation of nonconforming uses, it is the policy of the law to closely restrict such nonconforming uses and to strictly construe

provisions in zoning ordinances which provide for the continuance of nonconforming uses. *Nonconforming uses, inconsistent with a basic purpose of zoning, represent conditions which should be reduced to conformity as speedily as is compatible with the law and the Constitution.*

"*Id.,* 408 Pa. at 312-13, 183 A.2d at 543. (emphasis added)"

The court continues the analysis:

"Subsequently, in *Gross v. Zoning Board of Adjustment of the City of Philadelphia,* 424 Pa. 603, 227 A.2d 824 (1967), this court stated that 'the owner of property to which a lawful nonconforming use has attached enjoys a vested property right thereto which may not be abrogated, unless it is a nuisance, or abandoned, *or is extinguished by eminent domain . . .' Id.,* 424 Pa. at 607, 227 A.2d at 827. (emphasis added)

"In the present case appellant seeks to distinguish his situation from that of eminent domain by arguing that eminent domain refers only to actions taken by local authorities, as opposed to actions taken by the federal government. We cannot accept such a specious distinction. It is not asserted by Mr. Bachman that the federal government would not have instituted condemnation proceedings had he not negotiated a price for his property; and we are confident that they would have done so. Thus, Mr. Bachman was essentially in the same position as any victim of eminent domain.

"*The continuance of a nonconforming use is permitted to avoid a wrong notwithstanding that the use is an obstruction to a public purpose. The balance is settled by avoiding the injury to the property owner only so long as the governmental body fails to compensate for its loss. When, however, the governmental body acts by eminent*

*domain to take the property, just compensation for the loss is substituted.*[4] That a governmental body casts a jealous eye on a nonconforming use is also a balance; the use must not enlarge beyond its natural expectations, nor can it be moved from its original setting. To do either is not the original nonconforming use around which the zoning law was presumabl[y] designed, but rather a new venture, and new ventures must qualify under existing zoning laws.

"Because we see no grounds upon which to distinguish Mr. Bachman's situation from that addressed in *Gross, id.,* we hold that the government's action in purchasing Mr. Bachman's land, under threat of condemnation, had the effect of extinguishing the nonconforming use. Consequently, as the board correctly determined, he could not transfer that extinguished use; for to do so effectively constituted an initiation of a prohibited use, the conduct of which the local municipality was permitted to regulate.

---

"4. It is important to emphasize that the actions of a governing body proceeding under powers of eminent domain or condemnation distinguish the present situation from other 'taking' cases which are familiar to zoning law. See *e.g., Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); *Miller and Son Paving Inc. v. Wrightstown Township,* 499 Pa. 80, 451 A.2d 1002 (1982). In the latter situation the argument proceeds along due process lines; asserting that an owner's property was effectively taken by a change in zoning laws, without regard to compensation. However, in the present and like cases, there is no question that the landowner has been compensated for his loss." *Id.* at 186-88, 494 A.2d at 1105-1106. (emphasis added) (footnote omitted)

Of course, both *Amoco Oil* and *Bachman* involve uses that were lawfully nonconforming as to zoning before the

condemnation and the direct issue raised and decided involved the ability to maintain or transfer that existing nonconformity. An attempt to distinguish the authorities on this basis from that here involved, however,[220] would ignore the theoretical basis of both decisions. The protection afforded to nonconforming uses that predate zoning is of constitutional origin—an origin identical to that of the right to compensation when land is taken pursuant to the power of eminent domain. In the absence of protection for pre-existing uses, zoning would, as to those uses, constitute a "taking" for which just compensation would be constitutionally required.

At the same time, however, nonconforming uses are just that—nonconformities. They are contrary to the public purposes, the accomplishment of which was and remains, the land use regulation's justification. Therefore, when a condemnation alters the area or dimensions of a property in such a way as to reduce the uses (or the intensity of use) to which it may lawfully be devoted, this reduction is a compensable loss and the proper response is to include this loss in value along with the other losses caused by the taking and, thereafter, any right to violate the ordinance is extinguished and the land is brought, or remains, in conformity with zoning's purposes. Identical values are served by a refusal to permit the creation of a nonconformity created by condemnation as are served by refusal to permit the maintenance or transference of such a nonconformity. In each instance, compensation of the landowner in the context of the condemnation proceeding accomplishes a constitutionally adequate means to achieve post-taking conformity with the applicable zoning regulations.

---

220. In fact, the parties have not given us the benefit of their analysis of these authorities.

The city's position with respect to exception tract no. 1[221] depends in large measure on the legal correctness of its conclusion that regulatory nonconformities created by condemnation are protected. As the excerpt from the testimony of Manager Janssen, reproduced above, indicates, it was primarily on this basis that the city determined to be unnecessary the submission to Valley Township of an application for subdivision approval in connection with the creation of the exception tract no. 1. Moreover, the design, configuration, dimensions, and location of exception tract no. 1 are in large measure a consequence of this legal conclusion. Russell Dunlevy, following an account of his reliance on Valley Township Zoning Ordinance §435, having to do with the noncommercial keeping of livestock permitted by special exception in the C-Conservation zoning district,[222] was questioned by the city's special counsel as to the effect given in the layout of the excepted tract to the regulatory requirements of Valley Township, testified as follows:

"Q: When you considered the requirements of section 435 of the Valley Township zoning ordinance, did you consider them as requirements as opposed to guidelines as opposed to requirements?

"A: Well, the zoning requirements, but we used them as guidelines as we were attempting to make as conforming a remainder as we could. But we considered them guidelines.

"Q: Was there any reason why you didn't consider the requirements of section 435 as requirements in creating [exhibit] Saha-20?

221. The six-acre excepted parcel shown in the condemnation plot dated June 6, 2000, and appended as exhibit "F" to ordinance no. 1132-2000.

222. It is within this section that can be found the regulations described by Mr. Dunlevy elsewhere in his testimony and permitting a

"A: Yes. The reason is that this is a condemnation. The condemnation is going to leave a remainder. It was my experience and my opinion that hardships created by a condemnation would result in if variances are necessary or special exceptions are necessary for waivers of subdivision land development specific requirements, dimensional requirements, the property owner of the remainder would be able to demonstrate and obtain any relief necessary.[223] . . .

"Q: You previously testified that you either knew or expected that the zoning ordinance of Valley Township would require street frontage for a conforming lot. Do you recall that?

"A: Yes, I do.

"Q: And you previously testified that you did not in creating [exhibit] Saha-20 leave the Sahas with existing frontage that would have satisfied that requirement. Do you recall that?

"A: Yes, I do.

"Q: And do you recall the reason that you gave for not leaving the Sahas street frontage?

"A: Yes, I do.

"Q: What was that?

---

maximum of five animals with an average adult weight greater than 65 pounds. See Valley Township Zoning Ordinance §435.2(C). (Exhibit "C-16" p. 27-131; C006489.) As indicated, these regulations are applicable to properties located in the C-Conservation district and not to properties like that of the Sahas located in the R-1 Residential zone; thereby further supporting the conclusion that the particular characteristics of the excepted parcel were a product, at least in part, of a fundamental confusion as to the regulations applicable thereto.

223. Interestingly, Mr. Dunlevy is here apparently relying on some unarticulated theory of variance rather than nonconformance. The repeated reference to "hardship" in the witness' statement has no meaning in the doctrines applicable to prior nonconforming uses. Variance

"A: The reason I gave was that the hardship would be created by the condemnation, and therefore relief would be granted if any was necessary." [224]

Mr. Dunlevy concluded this line of testimony by responding in the affirmative to the following inquiry: "Was your thinking with regard to section 435 on exhibit C-10[225] similar to your thinking with regard to a 10-acre requirement in exhibit [Saha-]33[226] in terms of the hardship issue." [227]

Thus, the characteristics of the excepted parcel are a direct function of the legal conclusion of the draftsman, Mr. Dunlevy, as well as of the city manager from whom the draftsman received his instructions, that compliance with the literal and objective import of Valley Township's zoning regulations was not required. This factor assumes particular significance in combination with the expressed intent of city council to create in the excepted parcel a lot that conformed to applicable law including, particularly, the regulations of Valley Township.[228] The design of exception tract no. 1 as it took final form on exhibit "Saha-20" was lawful and in conformity with the expressed intent of city council

_____

relief is justified by the unnecessary hardship that results when property cannot be developed or used within the literal mandate of the applicable zoning regulations. See MPC §910.2, 53 P.S. §10910.2. As we noted above, the court in *Amoco Oil* also rejected the applicability of variance principles in the context of zoning violations created by partial condemnation. *Amoco Oil,* 679 A.2d at 1376-77.

224. Dunlevy pp. 252-56.

225. Exhibit "C-10" is a reproduction of chapter 27 of Valley Township's Code of Ordinances at pages 27-131 (C006489) and 27-132 (C006490); see exhibit "C-16," apparently differing only in the absence of Bates denomination.

226. The Valley Township Zoning Ordinance prior to its recodification as chapter 27 of the township's Code of Ordinances.

227. Dunlevy p. 256.

228. See the discussion of the testimony of council members Chertok, DeSimone and Rolston hereinbelow.

only if this legal conclusion was correct. For the reasons we have discussed in some detail having to do with the theoretical bases of *Amoco Oil Co.* and *Bachman,* we have rejected the legal conclusion on which Messrs. Dunlevy and Janssen predicated their decisions and actions. The conclusion must follow, therefor, that the particular characteristics of exception tract no. 1 are in conformity neither with law nor the expressed intent of city council.

The city argues, however, that the Sahas lack standing to enforce Valley Township's zoning regulations in this context. The complete answer is that the Sahas are not here attempting to enforce those regulations. Rather, the Sahas have directed our attention to the literal import of Valley Township's regulations in combination with the mistaken view of the city manager and consulting engineer as to the effect of those regulations and the expressed intent of city council to create a lawful excepted parcel, as compelling support for the contention, made relevant by such authorities as *Winger v. Aires,* that the excepted parcel's characteristics are the product of legal error, the failure to consult those regulations most directly applicable, and the disregard of the expressed intent of the condemnor's governing authority; that is, the product of arbitrariness, caprice, and an abuse of discretion. To make the same point in other terms: the condemnees contend that the issue of the effect of Valley Township's regulations is properly presented, not as grounds for objection to the condemnation per se, but as one of a number of compelling indicia of the city's failure to conduct a sufficient factual and legal investigation before determining the configuration of exception tract no. 1 and of the city's caprice and arbitrariness in so proceeding. The vagarious nature of the excepted parcel is an issue the Sahas have preserved and properly presented and the evidence and

argument offered in its support, including that described above, requires that we sustain the objection.

The city in its written argument presented herein describes the criteria employed in the design of "exception tract 1" as follows:

"City council established the criteria for the portion of the Saha property to be excluded from the condemnation. . . . City council decided to leave the Sahas six acres because it 'wanted to make sure that the Sahas had sufficient land around their home that [the condemnation] would not affect the quality of their life and their contact with their children and grandchildren who lived nearby.' Chertok, pp. 114, 120. . . . The actual six-acre parcel was designed to meet zoning requirements of Valley Township not only for lot size, but also to allow the Sahas to maintain their horses." Memorandum of law of condemnor at pp. 33-34. (some record references omitted)

The only detailed accounts of the process by which city council's criteria was translated into the particular calls and distances of exception tract no. 1 are found in the materially inconsistent testimony of the city manager and of the consulting engineer, Russell Dunlevy.

The city manager testified that the principal criterion given by him to Russell Dunlevy of Carroll Engineering was the area figure of six acres. This area figure was a product of city council's unanimous desire to permit the Sahas to continue in their equine activities on the property[229] and the manager's advice to council with respect to a "national standard in zoning ordinances." This "national standard" indicated a necessary minimum parcel area of

---

229. Council Member William Chertok testified that the intent of council was to permit the Sahas to maintain on the excepted parcel the horses that had traditionally served as a focus of the lives of the condemnees and their children and grandchildren.

five acres in order to permit the Sahas to maintain the number of horses typically seen on the property. To this figure, city council added one acre for reasons that are unexplained on this record, thereby producing the six-acre criterion communicated to Dunlevy. The engineer then prepared the plan of condemnation dated June 5, 2000, and admitted into evidence as exhibit "Saha-20" which, in turn, served as the basis for the "condemnation plot" dated June 6, 2000, and admitted into evidence as exhibit "Saha-36."[230] The city manager testified as follows after

"A: That is correct, we did not intend to have them diminish the use of the horses. It's my understanding that, based on the zoning, that this land [*i.e.,* the excepted tract] is eligible to house six horses.

"Q: And that would be the Valley Township Zoning Ordinance?

"A: As far as what I've been told. . . .

"Q: So it would be a surprise to both you and, I assume, other council members if you found out that you couldn't have any horses on the six-acre piece, wouldn't it?

"A: Yes.

"Q: And as you said before, that certainly was not your intent.

"A: That is correct."

Council Member Rolston's account is materially similar to that of Member Chertok.

"Q: . . . Do you know who suggested that it be six acres that be [sic] taken out?

"A: I think, if I'm not mistaken, there was an ordinance in Valley [Township]—a minimum requirement to have horses, the six acres. Because the city was being criticized for taking away the Sahas' ability to keep their horses. . . .

"Q: What was said as to where the six acres would be?

"A: That it should encompass the house. That it should give the Sahas access to the driveway."

The accounts of Chertok and Rolston are generally consistent with that of Council Member DeSimone.

230. Also found in the record, inter alia, as exhibit "F" to ordinance no. 1132-2000, see for example, exhibits "Saha-18" (the ordinance), "C-23" (June 26, 2000 city council agenda), and "C-34" (amended declaration of taking to which the initial declaration and its exhibits

having been shown exhibit "Saha-20" the full-size con-
demnation plan for the Saha property:[231]

"Q: And does it show the six-acre parcel that was to
remain in Saha ownership after the condemnation?

"A: Yes.

"Q: Was the six-acre number that was shown on Saha-
20 an arbitrary number?

"A: No. We went through a number of different discus-
sions and the final number was one that I think council
arrived at, and it was based on a fairly lengthy discus-
sion—I would say at least a half an hour and perhaps 45
minutes—following the presentation of issues associated
with it, the parcel of ground. . . .

"Q: Was six acres a magic number? That is, did it have
to come out to be six acres exactly?

"A: No. I would suggest that as part of that dialogue I
related some experience that I had as a zoning officer in
both Lower Gwynedd, specifically in Upper Southamp-
ton, and it related to the keeping of horses. And we knew

are appended), and exhibit "C" to the amended declaration of taking
(exhibit "C-34"). The condemnation plot has been designated on this
record, inter alia, as page C004745 and was recorded, inter alia, at
deed book 4794 p. 1619.

231. The full title of the plan is as follows: "Plan of condemnation
T.P.N. 38-02-29.1—T.P.N. 28-09-91, lands now or late of Richard A.
Saha and Nancy K. Saha situated in Valley and West Caln Townships,
Chester County, Pennsylvania, prepared for City of Coatesville, One
City Hall Place, Coatesville, Pennsylvania 19320, in the matter of the
acquisition by amicable negotiation or by the exercise of eminent do-
main of certain properties and property interests for use as a public
golf course and related facilities and for other recreational purposes
authorized by ordinance no. 1132-2000, enacted by the City of
Coatesville on June 26, 2000." The document is a one-sheet, engi-
neered plan, prepared by Carroll Engineering Corporation (and, par-
ticularly, by an engineer or draftsman associated therewith and having
the initials "G.D.M."), dated June 5, 2000, and denominated to job no.
00-8503.00.

that there were horses that were on the property with the Sahas, as we could see the corral, and also at times I think we saw upwards of three horses. I don't believe anybody saw any more than three.

"I related to council that the national standard in zoning ordinances typically is that you cannot keep a horse on property less than three acres, and that once you had the minimum size lot, that an effective measurement for ground for the maintenance of horses was an additional acre for each additional horse.

"Under that guideline the property should have been no less than five acres. However, I believe that council was concerned about the effective use of the property by the Sahas. I know prior to the map being drawn by Carroll Engineering nobody actually laid out and said 'well, this is where the six acres will go' but they felt that that would be an effective amount of ground." [232]

Russell Dunlevy's account of his instructions from Paul Janssen includes an express denial that he was given a six-acre area criterion and the assertion instead that the operative criteria communicated by the manager were (1) a 75-foot setback distance to be maintained from the Sahas' existing principal structures to the boundary of the excepted parcel; and (2) a minimum lot size which, under the zoning regulations applicable in the C-Conservation zoning district,[233] would permit the Sahas to maintain up

232. Janssen pp. 69-71. A materially identical account can be found in Mr. Janssen's response to the question "How was the decision made to exclude six acres from the eminent domain proceedings against the Saha property?" at Janssen pp. 243-45. This account includes the representation that the linear dimensions of the excepted parcel were a simple, mathematical product in which "Russ [Dunlevy] just calculated it out." *Id.* at 245.

233. As we have noted, the Saha property in Valley Township is located in the R-1 Residential, not the C-Conservation zoning district.

to five horses. In Mr. Dunlevy's account, the area ultimately achieved by the excepted parcel, being precisely six acres, was a pure coincidence resulting from the application of the dimensional setback criterion.

"I was never told specifically to exclude six acres. Mr. Janssen directed us to prepare a condemnation plan whereby the houses and structures would be excluded. We were to leave a minimum setback around those structures, the principal structures, of approximately—at a minimum of 75 foot—create a lot that met the minimum lot area for the zoning of Valley Township, which is three acres.

"Additionally, when we were reviewing the zoning ordinance of Valley Township it indicated that under livestock provisions in that district you're allowed to keep up to five animals that weighed more than 65 pounds, provided that each had an acre—you have an acre lot towards it.

"We were given to understand that the Sahas kept horses. Based on the zoning they were allowed to have a minimum [sic] of five. So the combination of trying to meet that requirement, provide the setback limits that we were directed to by the city manager, resulted in six acres. We were not told by anybody to come up with exactly six acres.

"Q: Do you know why the city was willing to exclude the area that you've just described from the condemnation? . . .

"A: City council at executive session or sessions said that we were not going to take the Sahas' house.[234]

"By the decision of city council being made not to take the house, that led to having to leave a lot to keep the house on it. City council made that decision.

---

234. Mr. Dunlevy repeats this account at a later point: "At least one or two city council meetings—and I don't remember which ones—they said they had promised the Sahas that they wouldn't take their house, and that was the reason for not taking the property, all the property." Dunlevy p. 51.

"Subsequent to that we were coming up with the perimeters [sic] for the lot, which are as I just related before: Leave 75 foot [sic] around the principal structures and reviewed the zoning ordinance and saw the issue related to the livestock, and the result is as you ultimately have it, which was the six acres." [235]

At a later point in his testimony, Mr. Dunlevy reconfirms his account of the city manager's instructions to maintain a setback distance from principal structures to the boundary of the exception parcel of not less than 75 feet while conceding that this setback distance was not, in fact, maintained.

"Q: Did Mr. Janssen tell you that he wanted to leave a minimum of 75 feet from the principal structures and the eminent domain line?

"A: Yes, he did. . . .

"Q: Can you measure the distance from the Saha house to the condemnation line?

"A: Scaling, this looks somewhere between 55 and 60 feet.

"Q: Clearly not 75?

"A: No, but we—no, not 75. . . . [Other measurements examined]

"Q: So, in point of fact you did not use the 75-foot measurement from the principal buildings in calculating the six acres?

"A: That's correct." [236]

Mr. Janssen, however, denies having at any time instructed Mr. Dunlevy to maintain a 75-foot setback.

"A: When I had the conversation with him [Russell Dunlevy] following the meeting was I said that all of the

235. Dunlevy pp. 48-50.
236. Dunlevy pp. 231-33.

zoning setback lines needed to be observed . . . . They needed to be set in such a way that the full setback line through Valley Township would be observed.

"Q: Do you know if the setbacks were observed on [exhibit] Saha-20?

"A: Yes. I reviewed the zoning code of Valley Township and matched it up with the various setbacks. The front yard is 35 feet, the side yards are 30 feet, and the rear yard is, I believe, 30 feet also. . . .

"Q: In Mr. Dunlevy's deposition that was taken on March 14, 2001, there was a discussion between Mr. Lentz [condemnees' counsel] and Mr. Dunlevy as to the instructions that Mr. Dunlevy had from you, Mr. Janssen, as to a minimum setback that would apply to the six-acre parcel, and specifically there was a discussion about a 75-foot minimum setback from the principal structures.

"Can you tell me if you had a discussion with Mr. Dunlevy about a 75-foot setback from the principal structures?

"A: I don't recall ever saying anything other than that the setbacks—the lot subdivision[237] needed to honor the Valley Township setback requirements. . . . 75 feet doesn't resemble anything that is required that I'm aware of with respect to the subdivision requirements. My concern was associated with the fact that council had given directive about the six acres and that I felt it was important that all of the setbacks be honored as part of that six acres. . . .

"A: There were two express directions that I gave Mr. Dunlevy in presenting this plan. [Exhibit "Saha-20".] One was to respect the setbacks and the other was to make it six acres."[238]

---

237. It is interesting, if not of particular significance, that Mr. Janssen so describes the excepted parcel.

238. Janssen pp. 245-50.

There can be no dispute that the intent of city council as to the excepted parcel was not realized in other significant respects as well, including the failure of the lot as designed in exhibit "Saha-20" and ultimately retained in the condemnees ownership, to include within its boundary the Sahas' only supply of potable water and in-ground sanitary sewage disposal field. On questioning by the city's special counsel, Mr. Janssen testified:

"Q: Do you understand that water supply [the spring described earlier] to be separated from the six-acre parcel on [exhibit] Saha-20?

"A: Yes.

"Q: When council condemned all but six acres of the Saha property, did it intend to cut off the Sahas from their water supply?

"A: No. They didn't." [239]

The condemnees here assert that caprice, irrationality, and abuse of discretion can be found first in the failure of Messrs. Janssen and Dunlevy (as well as the city's solicitor) to consult the regulations of Valley Township which speak specifically to the keeping of horses in the jurisdictional R-1 Residential zoning district and require a minimum lot size for that purpose of 10 acres.[240] There is no question that city council's instructions included a direction that the excepted parcel be designed so as to be lawful and in compliance with Valley Township's zoning regulations. Even more specifically, the record establishes beyond peradventure the expressed intent of council to design the excepted parcel so as to permit the Sahas to continue lawfully their keeping thereon of up to three

239. Janssen p. 253. With respect to the effect of excepted parcel's design in "cut[ting] off their septic drain field," see Janssen p. 491.

240. See exhibit "C-16" at sections 111.3. 202.2(A), and 317(A) (pp. 27-11 [C006374], 27-33 [C006396], and 27-91 [C0064531]).

horses. Given these uncontroverted facts and the extensive professional experience of Mr. Janssen as, in addition to his present position, the chief executive officer of Lower Gwynedd and Upper Southampton Townships[241] during both of which assignments a "part of [his] responsibilities . . . was as a zoning officer,"[242] there is simply neither explanation nor excuse for the failure to consult with the city's solicitor or the source of law most directly controlling the determination and the resort instead to "what [Mr. Janssen] considered to be a fairly good national trend for zoning that has to do with maintaining horses on a property. . . ."[243] Mr. Janssen's education and experience clearly informed him that "national trends" whether "fairly good" or otherwise are entirely beside the point and that an inquiry as to the zoning requirements for keeping horses on a particular property may be rationally resolved only with reference to the zoning regulations of the municipality in which the property is located. His failure to consult these regulations and the resulting failure of the excepted parcel to contain sufficient land for the purpose expressly mandated by city council, can be viewed as nothing other than vagary and caprice.

The uncertainty which we have discussed above on the part of Mr. Dunlevy as to the identity of the jurisdictional zoning district and the apparent result of his misdirection to Valley Township Zoning Ordinance §435 while disregarding the directly applicable requirements of section 317, only served to exaggerate the element of irrationality that infected the process.

---

241. See exhibit "C-14" which indicates a five-year tenure with Upper Southampton Township from 1992-1997 and a four-year tenure with Lower Gwynedd Township from 1984-1988.

242. Janssen p. 259.

243. Janssen p. 244.

We have no quarrel with the intent of city council as it was clearly expressed to the responsible agents. Council's desire that the excepted tract be designed so as to encompass the principal building and their curtilage while maintaining all required dimensional setbacks and containing sufficient overall area to permit the lawful continuance of the Sahas' equine husbandry, was entirely reasonable. Unfortunately, the excepted parcel as finally demarcated on exhibit "Saha-20" and in ordinance no. 1132-2000 and the declarations of taking, failed in numerous significant respects to realize these reasonable desires. It is in these failures, both their nature and their cause, that the condemnees assert, and we find, arbitrariness and caprice.

The city argues that these circumstances constitute, at most, a series of well-intentioned mistakes and that such errors, no matter their cause or consequence, can never justify judicial intervention. We disagree. We can discern (and the city has offered) no principled difference between the instant circumstances and the conduct condemned by the court in *Winger v. Aires* in the following terms:

"Although the board here proceeded vigorously in the assumed interests of the people of the borough, the zeal exercised in the execution of its duties was as excessive as its knowledge of the law applicable to the situation was lacking."[244]

The court could not have more clearly stated the principle here applicable when it wrote: "[u]nless the property is acquired for an authorized public use, *and after a suitable investigation leading to an intelligent, informed judgment by the condemnor, the condemnation is invalid"* in *Pittsburgh School District Condemnation Case,* 430 Pa. 566, 574, 244 A.2d 42, 46 (1968). (emphasis added)

---

244. *Winger v. Aires* at 244-45, 89 A.2d at 522.

Moreover, in *Speicher Condemnation Appeal,* 58 Pa. Commw. 321, 428 A.2d 282 (1981), the court expressly relied on evidence of the condemnor's prior determination to take significantly less ground as compelling the conclusion that the ultimate decision to condemn the larger parcel was an irrational abuse of discretion. *Id.* at 330, 428 A.2d at 287. Here, the draft development plan communicated to the condemnees and made the subject of all public presentations of the city from the fall of 1999 up to the enactment of ordinance no. 1132-2000 on June 26, 2000, a plan materially similar to exhibit "Saha-22," evidenced an intent to condemn about seven acres of the Sahas' lands,[245] a figure about one-sixth of the area of the property actually condemned.[246]

Finally with respect to the city's argument that its mistakes do not constitute an abuse of discretion, we note that a wealth of authorities in other contexts are directly to the contrary. As the court wrote in *In re Duran,* 769 A.2d 497, 506 (Pa. Super. 2001), quoting *Harman ex rel. Harman v. Borah,* 562 Pa. 455, 469, 756 A.2d 1116, 1123 (2000):

"Discretion must be exercised on the foundation of reason. An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will."

---

245. See exhibit "Saha-13" minutes of meeting of November 8, 1999.

246. Moreover, such record plans as exhibits "Saha-21" and "Saha-41" depict an excepted parcel approximately 14.5 acres in area and possessed of road frontage; in apparent compliance with the expressed intent of city council. We were told by the condemnees' counsel at oral argument that no challenge would have been here presented to a declaration of taking which had included an excepted parcel so described.

The familiar formulation found in many decisions including *Paden v. Baker Concrete Construction Inc.,* 540 Pa. 409, 412, 658 A.2d 341, 343 (1995), and *Mielcuszny v. Rosol,* 317 Pa. 91, 93-94, 176 A. 236 (1934), is:

"An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused."

To the same effect see for example, *Truesdale by Truesdale v. Albert Einstein Medical Center,* 767 A.2d 1060 (Pa. Super. 2001); *Johnson v. Henkels & McCoy Inc.,* 707 A.2d 237, 239 (Pa. Super. 1997).

In each of these authoritative formulations, a decision which is either manifestly unreasonable as shown by the evidence or is predicated on the misapplication of law, constitutes an abuse of discretion thereby justifying judicial intervention. The facts discussed in detail above make clear that the particular configuration and location of exception tract no. 1 was both manifestly unreasonable and the direct product of the misapplication of law. On either ground we must sustain the condemnees' objection thereto.

## CONCLUSIONS OF LAW

(1) This court possesses subject-matter jurisdiction of these preliminary objections interposed pursuant to Eminent Domain Code §406, 26 P.S. §1-406.

(2) The city was not authorized to amend its declaration of taking, without further formal action of the condemnor or leave of court, over the objection of the condemnees,

and some five months following the initial filing, after the interposition of preliminary objections, and during the period when this court had ordered evidentiary proceedings designed to address the issues raised by the initial filing.

(3) Notwithstanding the absence of authority of the city to effect an amended filing under the circumstances described and here extant, this court possesses the express power pursuant to Eminent Domain Code §406(e), 26 P.S. §1-406(e) to require the filing of an amended declaration in response to the interposition by the condemnees of preliminary objections to the initial declaration of taking.

(4) The creation of zoning violations by partial condemnations is not protected by the doctrines of nonconformance or variance and the reduction in allowable development or use that results from such violations, if any, must be an element of compensable value in the condemnation proceeding and, thereafter, any rights to violate the ordinance are extinguished.

(5) That portion of the Sahas' lands located in Valley Township are within an R-1 zoning district as defined and regulated pursuant to either exhibit, "Saha-33" or "C-16."[247]

247. See exhibit "C-16" p. C006560 (map) and C006395 (zoning ordinance section 202); exhibit "Saha-33A" (map) and "Saha-33" at section 203, p. 29. Mr. Dunlevy, the professional engineer responsible for translating the criteria promulgated by city council into the boundary of exception tract no. 1, a process that required evaluation of the Valley Township zoning regulations applicable to the Sahas' property, expressed in his deposition considerable confusion even as to the identity of the jurisdictional zoning district of Valley Township in which the Sahas' lands are located. See Dunlevy pp. 222-23 including the witnesses' conclusion, following an examination of exhibit "Saha-33A," that the jurisdictional zoning district is the C-Conservation district. Dunlevy p. 223. In fact, whether reference is made to exhibit "Saha-33A" or "C-16" at p. C006560, the Valley Township portion of

(6) "Agriculture" defined to include "the keeping or raising of livestock such as . . . horses," is a use permitted by right in the R-1 zoning district of Valley Township subject to the standards there incorporated by reference.[248]

(7) Among the standards incorporated by reference and applicable to any agricultural use in an R-1 zoning district of Valley Township is a minimum lot area of 10 acres.[249]

(8) The express intentions of city council, including the creation in the excepted parcel of a lot for retention by the condemnees which conformed to the zoning ordinance of Valley Township and its area, bulk, dimension, and use regulations applicable to the condemnees' existing residential and agricultural use and development, were not here met by the design and layout of the excepted parcel as depicted in exhibit "Saha-20," exhibit "F" to ordinance no. 1132-2000, and exhibit "C" to the amended declaration of taking.

(9) Specifically, the express intent of council to create an excepted parcel that complied with Valley Township's

the Saha property is located entirely within the R-1 zoning district. This inconsistency between the expert witnesses' testimony and the facts of record, on an issue of this central significance, greatly reduces the reliance we are able to place on his opinions.

248. See exhibit "C-16" at sections 111 (p. 27-11, C006374) and 202.2(A) (p. 27-33, C006396); "Saha-33" at section 112(C), p. 7.

249. See exhibit "C-16" at section 317(A) (p. 27-91, C006453); "Saha-33" at section 203(1) at p. 29 and section 316(1) at p. 89. In the original, spiral-bound, document admitted into the record as exhibit "Saha-33" the next page following section 310 on page 66 is page 90 and, thereafter, the pages are bound in declining numerical order. While this made resort to the exhibit a tedious process, the pertinent provision is nevertheless found as cited.

minimum lot area regulations would have required a minimum 10-acre lot and the lot as designed is precisely six acres in area.

(10) Moreover, the express intent of council to create a lawful excepted parcel would have required the design thereof to include road frontage.

(11) The failure of the excepted parcel to comply with the express direction of city council is the product of and evidences arbitrariness, caprice, error of law, and abuse of discretion.

## ORDER

And now, January 11, 2002, the preliminary objections interposed by Richard A. and Nancy K. Saha as condemnees pursuant to section 406 of the Eminent Domain Code, 26 P.S. §1-406 to the declaration of taking filed by the City of Coatesville as condemnor on August 2, 2000, and amended by filing of February 13, 2001, are sustained in part and overruled in part. Specifically, the condemnees' motion to strike the amended declaration of taking filed on or about February 13, 2001, is hereby granted. The condemnees' preliminary objection challenging the adequacy of the statement of purpose contained in the declaration of taking filed on or about August 2, 2000, is sustained with leave and direction to the city to amend the said declaration so as to specify that the purpose for which the condemnees' lands have been taken is limited to, and those lands shall be used for, nothing other than as and for a municipal golf course, a component thereof, or a facility directly ancillary thereto such as a golf training facility under the auspices of, and as a member of, The First Tee National Association, an

initiative of the World Golf Foundation dedicated to providing affordable access to golf especially to youth of limited financial means. The said amendment shall be included in the amended filing described immediately below.

The condemnees' preliminary objection challenging the informational basis for, and the rationality of, the creation of exception tract no. 1 for retention by the condemnees, is sustained with leave and direction to the city to amend the said declaration so that the tract excepted therefrom for retention by the condemnees conforms to an application for subdivision approved by the governing body of Valley Township. Without limiting the foregoing, and absent relief granted by the Valley Township Zoning Hearing Board or an amendment of the applicable design regulations, the excepted tract shall provide road frontage in compliance with Valley Township's subdivision design regulations and shall be of sufficient area so as to include the condemnees' existing home, accessory buildings, water source, sub-surface sanitary sewage disposal facility, and so as to permit the housing thereon of up to three horses, all in conformance with the use and area and bulk and design regulations of Valley Township. Unless the time period is extended by this court for good cause shown, the city's application for subdivision approval shall be submitted to Valley Township not later than 60 days from the date hereof. The amended declaration of taking shall be filed with this court not later than the 10th day next following approval of the city's application for subdivision approval. In all other respects the condemnees' preliminary objections are hereby overruled.